1  RACHEL P. STOIAN – SBN 300159
   stoian.rachel@dorsey.com
2  DORSEY & WHITNEY LLP
   167 Hamilton Avenue, Suite 200
3  Palo Alto, CA 94301
   Telephone:  (650) 857-1717
4  Facsimile:  (650) 857-1288

5  Attorneys for Creditor,
   Adhara Aerospace and Defense, LLC
6

7              UNITED STATES BANKRUPTCY COURT

8              CENTRAL DISTRICT OF CALIFORNIA

9

10 | In re: | Case No. 2:24-bk-17820-BB |
| --- | --- |
| SKYLOCK INDUSTRIES, INC., | Chapter 11 |
| Debtor. | OBJECTION OF ADHARA AEROSPACE AND DEFENSE LLC TO DEBTOR'S MOTION FOR ORDER AUTHORIZING: (1) USE OF CASH COLLATERAL ON AN INTERIM BASIS; AND (2) SETTING A FINAL HEARING ON USE OF CASH COLLATERAL |
| | **Hearing:** Date:  October 1, 2024 Time:  10:00 a.m. Place:  Courtroom 1539     255 E. Temple Street     Los Angeles, California Judge: Hon. Sheri Bluebond |

        Adhara Aerospace and Defense, LLC, as assignee from PPL Optical Holdings, LLC, as

assignee from Pasadena Private Finance, LLC ("Adhara"), by and through its undersigned counsel,

submits this opposition (the "Opposition") to the motion of chapter 11 debtor Skylock Industries,

Inc. (the "Debtor") for entry of an order authorizing: (1) use of cash collateral on an interim basis;

and (2) setting a final hearing on use of cash collateral [Dkt. 3] (the "Motion"), and respectfully

represents and warrants as follows:

## I.    PRELIMINARY STATEMENT

While the factual and procedural background that led to this point is somewhat complex, this Opposition is simple – the Debtor does not have the wherewithal to satisfy its purported budget and Adhara's collateral is diminishing in value under the guidance of the Debtor's Chairman Jeffrey B. Crevoiserat. As a result, the Debtor cannot provide Adhara with the adequate protection required by the Bankruptcy Code and the Motion should be denied. Notwithstanding, the Debtor's efforts to paint Adhara as a "bad lender" set on sapping the life out of an otherwise viable company, the reality is that Adhara (through its predecessors) has acted in good faith for well over a year to work with the Debtor to achieve a consensual workout of Adhara's debt which the Debtor admittedly cannot afford to service. Even today, the Debtor proposes to pay Adhara only $2,489,[1] representing less than 6% of what the Debtor would otherwise be required to pay under the Adhara Loan (defined below). That is simply not enough and does not provide Adhara with the adequate protection to which it is entitled. Most important, the proposal demonstrates the Debtor's persistent bad faith in its dealings with Adhara. For these reasons and those set forth below, Adhara respectfully requests that this Court deny the Motion.

## II.    FACTUAL BACKGROUND[2]

### A.    The Adhara Loan

Adhara understands that the Debtor started looking for additional financing to support its operations in or around 2019, but was unable to secure such financing due to certain accounting irregularities. *See* Declaration of Jason Shlecter in Support of this Opposition (the "Shlecter Decl."), filed simultaneously herewith, ¶ 2.

---

[1] While the Motion initially proposed payments of $4,000 to Adhara, the Debtor has since reduced that proposed payment to just $2,489. *See* Dkt. 18.

[2] The Motion and Declaration of Jeffrey B. Crevoiserat in Support of the Motion (the "Crevoiserat Decl.") contain numerous factual inaccuracies and misrepresentations, some of which Adhara addresses in this Opposition to the extent they are relevant to the relief being sought by the Debtor and Adhara's opposition thereto. For the avoidance of doubt, Adhara's failure to specifically address any factual allegation in the Motion or Crevoiserat Decl. shall not be construed as an admission that such factual allegation is true or uncontested by Adhara and Adhara reserves its rights to contest any factual allegation not expressly addressed herein.

1  On or about August 2, 2022, the Debtor and its affiliate 1290 Optical Drive, LLC ("1290

2  Optical"), collectively as borrower, Pasadena Private Finance, LLC ("PPF") (Adhara's

3  predecessor), as agent and lender, Skylock Holding, L.L.C., as affiliate guarantor, and Mr.

4  Crevoiserat, as personal guarantor, entered into a Loan Agreement pursuant to which PPF agreed

5  to issue a $7,500,000 term loan and $1,500,000 line of credit in favor of the Debtor and 1290

6  Optical (the "Adhara Loan" and, together with all of the ancillary loan documents, the "Adhara

7  Loan Documents"). The Adhara Loan was secured by, among other things, a deed of trust with

8  respect to the real property owned by 1290 Optical located at 1290 W. Optical Drive, Azusa,

9  California 91702 (the "Optical DOT" and "Optical Drive Property", respectively), a blanket lien

10  on all personal property owned by the Debtor, perfected by duly filed UCC-1 financing statement

11  (the "UCC Lien"), and a stock pledge. *See* Shlecter Decl. ¶ 3.

12  Adhara understands that its UCC Lien is second in line only to the U.S. Small Business

13  Association (the "SBA"), with original principal amount of $500,000, and potentially certain

14  purchase money security interests in equipment purchased by the Debtor. *Id.* ¶ 4.

15  **B.    Repeated Defaults and Delays**

16  The Debtor defaulted on the Adhara loan almost immediately, failing to timely make

17  required interest payments starting in October 2022, among other defaults. *Id.* ¶ 5. PPF (the then-

18  holder of the Adhara Loan) thereafter sought to engage in good faith negotiations and

19  communications with the Debtor in order to achieve an orderly work out of the Adhara Loan. *Id.*

20  These efforts continued for approximately fifteen months and included workout proposals, waivers

21  of loan covenants, allowance of payment delays, and other concessions by PPF. *Id.* Unfortunately,

22  these efforts were repeatedly stymied by Mr. Crevoiserat's seeming refusal to engage in

23  negotiations and communications in good faith or to allow the Debtor to fulfill its promises. *Id.*

24  A pattern of delay emerged over the course of this time period whereby PPF's efforts to

25  work with the Debtor and discuss potential workouts of the Adhara Loan were met with initial

26  verbal agreements from Mr. Crevoiserat on behalf of the Debtor, but the Debtor's engagement

27  would inevitably wane. *Id.* ¶ 6. In response to requests for financial records, Mr. Crevoiserat would

28

-3-
ADHARA AEROSPACE AND DEFENSE, LLC'S OPPOSITION TO DEBTOR'S CASH COLLATERAL MOTION
CASE NO. 2:24-BK-17820-BB

show information on his laptop, assure PPF that such information would be provided after a meeting, but it was never forthcoming. *Id.* Indeed, despite repeated requests for financial disclosures and repeated promises by Mr. Crevoiserat that they were forthcoming, the Debtor failed to produce accurate and fulsome financial records that were required to be produced pursuant to the Adhara Loan Documents and that PPF (and its successors) would understandably need to assess the various work out options. *Id.*

On or about January 1, 2024, the parties entered into a Forbearance Agreement with respect to the Adhara Loan pursuant to which the Debtor acknowledged the existence of nine (9) specified events of default and PPF agreed to hold off on pursuing its rights and remedies in order to allow the Debtor to seek a sale of assets or refinancing transaction that would result in funds sufficient to pay off the outstanding obligations under the Adhara Loan. *Id.* ¶ 7. The Forbearance Agreement was terminated January 23, 2024 due to payment default, despite the payment amount being reduced from its originally scheduled amount. *Id.* PPF went through extensive drafting of an amended forbearance agreement in February and March 2024 that the Debtor ultimately declined to sign, despite the financial relief it would provide. *Id.*

On March 1, 2024, PPF retained Oakwood Business Associates, LLC, a consultancy owned and operated by William Baribault. *Id.* ¶ 8. Mr. Baribault has significant aerospace turnaround experience and was retained to provide guidance to the Debtor on how to better manage operations. *Id.* Mr. Baribault executed a non-disclosure agreement as a condition of his work. Mr. Baribault attempted to fulfill his duties under the consulting agreement, but was ultimately hindered by Mr. Crevoiserat who refused to work with him or consider his suggestions for turning around the Debtor. *Id.*

On March 18, 2024, PPF advanced $50,000 to the Debtor so that it could fund its payroll and operations in general. *Id.* ¶ 9.

Notwithstanding termination of the Forbearance Agreement, PPF did not immediately exercise its remedies. Instead, it continued in good faith to attempt to negotiate a consensual work out of the Adhara Loan. *Id.* ¶ 10. The Debtor, under the direction of Mr. Crevoiserat, refused to

ADHARA AEROSPACE AND DEFENSE, LLC'S OPPOSITION TO DEBTOR'S CASH COLLATERAL MOTION
CASE NO. 2:24-BK-17820-BB

engage in such efforts in good faith and persisted in its pattern of delay and not providing financial documents to PPF. *Id.*

As a result, in or around March 2024, PPF advised the Debtor that it intended to proceed with a foreclosure with respect to the Optical Drive Property. *Id.* ¶ 11. PPF continued to attempt to negotiate a consensual work out of the Adhara Loan, but was met with delay and resistance from the Debtor. *Id.*

On May 21, 2024, at the direction of PPF, the trustee appointed pursuant to the Optical DOT issued a formal Notice of Trustee's Sale to 1290 Optical which informed it that a public sale would be conducted with respect to the Optical Drive Property on June 20, 2024 (the "Optical Drive Sale"). *Id.* ¶ 12.

Mr. Crevoiserat advised PPF that there were parties interested in purchasing the Optical Drive Property, but he failed to make meaningful progress with these interested parties because he could neither provide credible tenant financials nor provide comfort around various property-related issues. *Id.* ¶ 13. PPF was able to connect with one "potential buyer" who advised PPF that they could not work with Mr. Crevoiserat because he failed to provide sufficiently detailed information after an initial call. *Id.* PPF encouraged Mr. Crevoiserat to have the interested parties attend the Optical Drive Sale. *Id.* None did. *Id.*

On June 20, 2024, PPF executed an Assignment of Notes and Liens in favor of PPL Optical Holdings, LLC ("PPL Optical"), a then-newly formed affiliate of PPF, pursuant to which the Adhara Loan Documents were assigned by PPF to PPL Optical, including the Optical DOT (the "PPL Assignment"). *Id.* ¶ 14. As is customary in this context, PPL Optical was formed to own the Optical Drive Property in the event it was the successful bidder at the Optical Drive Sale since PPF is a lender and not in the business of owning and operating real property. *Id.*

On June 20, 2024, the trustee conducted the duly noticed Optical Drive Sale. *Id.* ¶ 15. No one aside from representatives of PPL Optical appeared at the Optical Drive Sale and, accordingly, PPL Optical credit bid $5,000,000 for the Optical Drive Property. *Id.*

On June 21, 2024, the trustee executed a Trustee's Deed Upon Sale pursuant to which title to the Optical Drive Property was transferred to PPL Optical (the "Optical Drive Deed").[3] *Id.* ¶ 16.

On June 25, 2024, the PPL Assignment and the Optical Drive Deed were recorded in the Official Records of the Recorder's Office, Los Angeles County, California on June 25, 2024 at 8:00 a.m. and assigned document identification nos. 20240410130 and 20240410131, respectively. *Id.* ¶ 17.

As the new owner of the Optical Drive Property, and as a further demonstration of its good faith, PPL Optical offered to lease the Optical Drive Property to the Debtor on a month-to-month basis for just $50/month (plus utilities, taxes, and maintenance costs) even though the fair market rent would be closer to $50,000/month. *Id.* ¶ 18. The Debtor accepted the lease terms and has occupied the Optical Drive Property subsequent to the public sale. *Id.*

In addition to agreeing to extraordinarily below-market lease of the Optical Drive Property, PPL Optical continued its good faith efforts to achieve a workout of the Adhara Loan with the Debtor. But as had been the case prior to the public sale of the Optical Drive Property, the Debtor did not match these efforts and no resolution could be achieved. *Id.* ¶ 19.

On September 16, 2024, PPL Optical executed an Assignment of Notes and Liens in favor of Adhara, a newly formed affiliate of PPF, pursuant to which the Adhara Loan Documents were assigned by PPL Optical to Adhara, including the UCC Lien. *Id.* ¶ 20.

On September 16, 2024, Adhara issued a Notification of Disposition of Collateral pursuant to which it notified the Debtor, Mr. Crevoiserat, and other parties with interest in the collateral that Adhara would conduct a public foreclosure sale of the Debtor's personal property subject of the UCC Lien (the "UCC Collateral") on September 27, 2024 (the "UCC Sale"). *Id.* ¶ 21.

---

[3] The Debtor suggests that the anti-deficiency provision set forth in section 580d of the California Code of Civil Procedure applies to the Optical Drive Sale, presumably referring only to subsection (a) of that provision while ignoring subsection (b) which clarifies that secured creditors are not precluded from pursuing all other collateral given to secure their indebtedness. It is also worth noting that the Optical Drive Sale was directed only at Optical Drive's collateral – the Optical Drive Property – and not the collateral of its co-obligor, the Debtor. *See infra* Section III.B (discussing relevant California law as it relates to secured creditors' rights with respect to collateral). The Debtor's suggestion is nothing more than a distraction.

ADHARA AEROSPACE AND DEFENSE, LLC'S OPPOSITION TO DEBTOR'S CASH COLLATERAL MOTION
CASE NO. 2:24-BK-17820-BB

As is customary in this context, Adhara was formed to own and operate the UCC Collateral in the event it was the successful bidder at the UCC Sale. *Id.* ¶ 22. Indeed, Adhara was positioned to ensure that operation of the Debtor's business would transition as smoothly as possible following the UCC Sale, both as a means of maximizing the value of Adhara's collateral and to avoid the loss of jobs and customers of the business. *Id.*

Both prior to and after issuance of the Notification of Disposition of Collateral, Adhara engaged in concerted marketing efforts with respect to the UCC Collateral. *Id.* ¶ 23. These efforts include contacting twenty-eight third parties that may be interested in buying all or part of the UCC Collateral, entering into non-disclosure agreements and providing more detailed information to eleven such parties, and providing site visits to five interested parties. *Id.* Adhara anticipated that that there would be active bidding at the UCC Sale. *Id.*

### C. The Bankruptcy

On September 26, 2024, in order to prevent the UCC Sale from going forward, the Debtor filed its voluntary chapter 11 petition [Dkt. 1] (the "<u>Petition</u>") in the United States Bankruptcy Court for the Central District of California (the "<u>Court</u>").[4]

As of the date of this Opposition, the Debtor has not filed its schedules or statement of financial affairs.

The list of 20 largest unsecured creditors and creditor matrix appear to be missing certain significant creditors, including Spirit AeroSystems (alleged claim in excess of $10 million), Blank Rome LLP (the Debtor's former bankruptcy counsel), L&J Investment Holdings LLC (pending litigation claim of approximately $90,000), and Blum Courtyard Associates (former landlord with claim of almost $500,000). *Id.* ¶ 26.

On September 27, 2024, the Debtor filed four first day motions: (1) the instant Motion for authority to use cash collateral; (2) a motion to approve payment of certain prepetition employee wages [Dkt. 5] (the "<u>Wage Motion</u>"); (3) a utilities motion [Dkt. 6] (the "<u>Utilities Motion</u>"); and

---

[4] It is notable that the Petition was filed without a copy of the corporate resolution authorizing its filing. It is not presently known by Adhara who on that board of directors signed off on the filing or whether they had sufficient corporate authority to do so.

(4) a motion to authorize continued use of prepetition bank accounts [Dkt. 7] (the "<u>Cash Management Motion</u>" and, together with the Wage Motion and the Utilities Motion, the "<u>Other First Day Motions</u>").[5]

What is noticeably absent from the slate of first day motions is a motion for approval of debtor-in-possession financing. The Debtor has not been in a position to pay all of its ongoing monthly expenses for quite some time, and it is hard to fathom how it will do so now in this chapter 11 proceeding without the assistance of additional funding. Rather than not needing such financing, it seems that the Debtor was likely unable to get any lender to take on the risk.

In the Motion, the Debtor attests to its various assets, including certain inventory and accounts receivable, but does not mention that a significant portion of those assets are tied up in a dispute with Spirit AeroSystems who has asserted a claim against the Debtor in excess of $10 million. *Id.* ¶ 29. Of particular importance in this regard is the fact that the Debtor has historically over-relied on Spirit AeroSystems to provide working capital as the Debtor was otherwise cash-strapped and unable to properly manage its own working capital position. *Id.*

As for the Debtor's equipment, it is not clear to Adhara where the ascribed value of $2,787,500 came from as the Debtor has not provided a recent appraisal of its equipment to Adhara (or its predecessors) and there is none referenced in the Motion. *Id.* ¶ [●].

The extent of the secured claims against the Debtor also appears to be undercounted. Based on the proof of claim filed by the SBA, its claim is $520,613.87 – not $485,000. Adhara also understands that Mitsubishi may be owed in excess of $152,000 – not $42,757. *Id.* ¶ 31. Thus, while the Debtor asserts that the aggregate secured claims total approximately $5,516,795, they in fact total at least $5,661,652.

The Debtor's proposed budget filed in support of the Motion (the "<u>Budget</u>") is both inaccurate and disconcerting. While Adhara generally agrees with the projected gross receipts, a number of the purported expenses are questionable:

---

[5] While Adhara disagrees with certain of the factual allegations contained in the Other First Day Motions, Adhara does not oppose the relief sought by such motions.

ADHARA AEROSPACE AND DEFENSE, LLC'S OPPOSITION TO DEBTOR'S CASH COLLATERAL MOTION

CASE NO. 2:24-BK-17820-BB

1. *Rent Expense* – The Debtor is required to pay only $50/month for its use and occupancy of the Optical Drive Property, not $5,000 and $8,000 sporadically every week or so.

2. *Insider Payroll* – Does Mr. Crevoiserat intend to pay himself $10,500/week?

3. *Auto Expense* – Adhara believes this $1,717/week is a payment for Mr. Crevoiserat's personal automobile, an expense that should not be borne by a company that cannot service its funded debt obligations.

4. *Repairs and Maintenance* – Adhara would like to see documentation to support a need to spend almost $2,000/week on repairs and maintenance.

5. *Computers and Software* – Adhara would similarly like to see documentation to support spending $550/week on computers and software.

6. *Other* – What comprises the "other" expenses of $1,070/week?

Perhaps the most egregious expense in the Budget is the proposed aggregate adequate protection payment of $5,000/month. While Mr. Crevoiserat does not appear to be making any personal sacrifice, the Debtor is proposing to have Adhara make a huge sacrifice and accept just $2,489/month on a loan whose monthly interest only payment is $42,100, that is, less than 6% of the payment that is required under the Adhara Loan Documents. Even more galling is the request to not actually make such payments to Adhara, but to place them "in reserve" in the Debtor's cash collateral account pending resolution of Adhara's claim.

## III.    ARGUMENT

### A.    The Motion Must Be Denied Because Adhara Will Not Be Adequately Protected

Bankruptcy Code § 363(c)(2) provides that a debtor may use cash collateral if the party with an interest in such cash consents or the court authorizes such use. 11 U.S.C. § 363(c)(2). Where a court does authorize the use of cash collateral, it shall condition such use "as is necessary to provide adequate protection of" a party's interest in such cash collateral. 11 U.S.C. § 363(e). The burden lies with the moving party to establish adequate protection. 11 U.S.C. § 363(p)(1). Here, the Debtor

has pointed to an alleged equity cushion with respect to the collateral and the proposed adequate protection payments as sufficient to adequately protect Adhara's interest in its cash collateral. They are not.

As is relates to the "equity cushion," it is not evident where the Debtor derived the values ascribed to its various assets. Indeed, the Debtor does not refer to any appraisals or other basis for the figures ascribed to each of the types of collateral. The Debtor's receivables are also tied up in its dispute with Spirit AeroSystems, potentially significantly diminishing the value of such asset. Meanwhile, the aggregate value of secured claims appears to be more than what the Debtor has suggested, further eroding any potential equity cushion. Most problematic, however, is that the overall value of the Debtor's business and much of the collateral will diminish every day that Mr. Crevoiserat remains at the helm. The Debtor's books and records have been kept hidden by Mr. Crevoiserat, suggesting he has potentially engaged in improper bookkeeping and/or diversion of the Debtor's assets (a conclusion in keeping with the findings of a forensic accountant retained by Adhara to review the Debtor's financials). Mr. Crevoiserat appears to direct the Debtor to act principally in ways that personally benefit himself at the expense of the Debtor's creditors, customers, and other stakeholders. This is borne out by the Budget which appears to provide for weekly payments to or on behalf Mr. Crevoiserat in excess of $11,570. In contrast, the Debtor is proposing aggregate adequate protection payments of just $5,000/month. The disconnect between creditors' interests and Mr. Crevoiserat's interests is yawning. Adhara thus believes that the value of the Debtor's business – and Adhara's collateral – will diminish each day that Mr. Crevoiserat remains in charge and the miniscule adequate protection payments will not be sufficient to make up for that lost value.

Adhara also has well-placed concerns that the Debtor will be unable to adhere to its proposed Budget. Indeed, the Debtor itself is requesting authority to vary its budget by 15% which is far too great a variance under the circumstances. The Budget is tight and permitting a variance of that magnitude may throw the entire thing off kilter, leaving creditors such as Adhara to suffer the consequences. More problematic are the inaccuracies in the Budget itself, suggesting that it is

ADHARA AEROSPACE AND DEFENSE, LLC'S OPPOSITION TO DEBTOR'S CASH COLLATERAL MOTION
CASE NO. 2:24-BK-17820-BB

1   not fully tethered to the Debtor's reality. Take, for example, the rent expense under the Budget –

2   while Optical PPL could have charged the Debtor upwards of $50,000/month, it only charges the

3   Debtor $50/month. And yet, the Budget reflects seemingly random payments every other week or

4   so of $5,000 and $8,000. Meanwhile, the Debtor has large line items for seemingly inflated

5   expenses like repairs and maintenance, computer and software, and "other" with essentially no

6   visibility into what exactly those expenses are comprised of. Finally, the Budget includes large line

7   items for the apparent personal benefit of Mr. Crevoiserat – insider payroll and automobile expense.

8   Adhara should not be asked to float the lavish lifestyle of Mr. Crevoiserat while essentially

9   unwillingly financing the case by taking less than 6% of the monthly payments to which it would

10  otherwise be entitled.

11        Adhara thus submits that the Debtor has not satisfied its burden of demonstrating that

12  Adhara will be adequately protected if the Debtor is authorized to use Adhara's cash collateral. As

13  such, the Motion must be denied.

14        **B.      In the Event Interim Relief or Final Relief is Granted, Adequate Protection
               Payments to Adhara Should Not Be Held in Reserve**

15

16        In the event this Court overrules this Opposition and authorizes the Debtor to use its cash

17  collateral, whether on an interim or final basis, the Debtor should be required to make its adequate

18  protection payments directly to Adhara and not hold them in reserve. The Debtor's apparent basis

19  for this position are its allegations of lender liability and the outcome and impact of the Optical

20  Drive Sale.

21        As it relates to lender liability, the record demonstrates that Adhara worked in good faith

22  for well over a year to achieve a consensual workout of the Adhara Loan. The fact that the Debtor

23  ultimately refused to similarly engage in such efforts in good faith does not give rise to a claim

24  against Adhara. In California, lenders do not owe borrowers a duty of care unless their involvement

25  in the "loan transaction exceeds the scope of its conventional role as a mere lender of money."

26  *Flores v. EMC Mortg. Co.*, 997 F. Supp. 2d 1088, 1113 (E.D. Cal. 2014) (quotation and citation

27  omitted). Most important in this context, "[t]he success of a borrower's investment is not a benefit

28

-11-

of the loan agreement which [a] Bank is under a duty to protect. . . It is simply not tortious for a commercial lender to lend money, take collateral, or to foreclose on collateral when a debt is not paid." *Id.* (quotation and citation omitted). Here, Adhara (and its predecessors) agreed to various concessions, such as the Forbearance Agreement, and hired a turnaround consultant to assist the Debtor in righting the ship. When it was apparent that the Debtor would not be matching Adhara's efforts, Adhara properly pursued its remedies under the Adhara Loan Documents and applicable law. The Optical Drive Sale resulted in the highest and best offer for the Optical Drive Property as demonstrated by the fact that not a single other bidder showed up, including the parties Mr. Crevoiserat suggests were interested in buying the property. These actions simply do not give rise to lender liability claims or a basis to hold Adhara's adequate protection payment in reserve.

As it relates to the Optical Drive Sale, the Debtor suggests that such sale divested Adhara of the right to pursue any deficiency under applicable law. That is simply not the case. While section 580d(a) of the California Code of Civil Procedure limits a secured party's right to seek a deficiency after conducting a non-judicial foreclosure, section 580d(b) makes abundantly clear that subsection (a) "does not affect the liability that a guarantor, pledgor, or other surety might otherwise have with respect to the deficiency, or that might otherwise be satisfied in whole or in part from other collateral pledged to secure the obligation that is the subject of the deficiency." Cal. Code Civ. P. § 580d(c); *see Hodges v. Mark*, 49 Cal. App. 4th 651, 656 (2d Dist. 1996) ("California's anti-deficiency laws do not preclude a creditor from pursuing all security given to collateralize an indebtedness. Thus, a guarantor of a promissory note secured by a deed of trust is not protected against a deficiency judgment. A guaranty is simply additional security for the obligor's debt." (quotation and citation omitted)). Adhara thus has every right to continue pursuing its collateral secured by the UCC Lien. Moreover, the anti-deficiency rule only bars direct claims for a deficiency against the borrower whose collateral was subject of a nonjudicial foreclosure. Here, that was 1290 Optical – not the Debtor. Nothing about the Optical Drive Sale limited Adhara's right to pursue its claims against the Debtor or the Debtor's collateral. As such, the Optical Drive Sale does not provide any basis for reserving Adhara's adequate protection payments.

ADHARA AEROSPACE AND DEFENSE, LLC'S OPPOSITION TO DEBTOR'S CASH COLLATERAL MOTION
CASE NO. 2:24-BK-17820-BB

1    As set forth above, to the extent this Court overrules this Motion, Adhara submits that any

2  adequate protection be paid directly to Adhara, not held in reserve.

3                                    **IV.    CONCLUSION**

4    For the reasons set forth above, Adhara respectfully requests that this Court deny the Motion

5  and grant such other, further, and different relief as it deems just and proper.

6  Dated:  September 30, 2024                    DORSEY & WHITNEY LLP

7

8                                           By:  */s/ Rachel P. Stoian*
                                                 RACHEL P. STOIAN
9                                                Attorneys for Creditor,
                                                 Adhara Aerospace and Defense, LLC
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-13-