RACHEL P. STOIAN – SBN 300159
stoian.rachel@dorsey.com
DORSEY & WHITNEY LLP
167 Hamilton Avenue, Suite 200
Palo Alto, CA 94301
Telephone: (650) 857-1717
Facsimile: (650) 857-1288

Attorneys for Creditor,
Adhara Aerospace and Defense, LLC

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>SKYLOCK INDUSTRIES,<br><br>　　　　Debtor. | Case No. 2:24-bk-17820-BB<br><br>Chapter 11<br><br>DECLARATION OF JASON SHLECTER IN SUPPORT OF ADHARA AEROSPACE AND DEFENSE LLC'S MOTION TO DISMISS CHAPTER 11 CASE PURSUANT TO 11 U.S.C. § 1112(b) COLLATERAL<br><br>**Hearing:**<br>Date:　TBD<br>Time:　TBD<br>Place:　Courtroom 1539<br>　　　　255 E. Temple Street<br>　　　　Los Angeles, California<br><br>Judge: Hon. Sheri Bluebond |

I, Jason Shlecter, declare as follows:

1.　　I am a Director of Adhara Aerospace and Defense, LLC, as assignee from PPL Optical Holdings, LLC, as assignee from Pasadena Private Finance, LLC ("Adhara"). I have personal knowledge of the following facts, and could competently testify thereto if called upon to do so. I submit this declaration in support of Adhara's motion for entry of an order dismissing this chapter 11 case pursuant to 11 U.S.C. § 1112(b) and granting related relief (the "Motion").

-1-

### A. The Lending Entities

2. Pasadena Private Finance, LLC, as agent and Adhara's predecessor ("PPF"), is a pro-business private lending institution formed in 2019. Since its inception, PPF has made fifty-one loans totaling $237 million. PPF has a reputation for working alongside its borrowers when they need additional capital or run into financial issues to come up with creative and reasonable solutions to their financial challenges thereby preserving and/or creating over 3,000 jobs. This reputation is borne out by the fact that the debtor in this case – Skylock Industries, Inc. (the "Debtor") – is the first borrower that PPF has exercised its rights to foreclose upon.

3. PPL Optical Holdings, LLC ("PPL Optical," and together with PFF and Adhara, the "Adhara Entities") and Adhara, both wholly-owned subsidiaries of PPF, are, respectively, the prior assignee and current assignee of the Adhara Loan. *Id.* I also feel compelled to note that PPF's lending and investing arms are operated separately and their respective employees do not communicate with each other regarding their respective loans and investments in order to avoid any conflicts of interest.

### B. The Adhara Loan

4. I understand that the Debtor started looking for additional financing to support its operations in or around 2019, but was unable to secure such financing due to certain accounting irregularities.

5. On or about August 2, 2022, the Debtor and its affiliate 1290 Optical Drive, LLC ("1290 Optical"), collectively as borrower, Pasadena Private Finance, LLC ("PPF") (Adhara's predecessor), as agent and lender, Skylock Holding, L.L.C., as affiliate guarantor, and Mr. Crevoiserat, as personal guarantor, entered into a Loan Agreement pursuant to which PPF agreed to issue a $7,500,000 term loan and $1,500,000 line of credit in favor of the Debtor and 1290 Optical (the "Adhara Loan" and, together with all of the ancillary loan documents, the "Adhara Loan Documents").[1] The Adhara Loan was secured by, among other things, a deed of trust with

---

[1] The Adhara Loan Documents are voluminous and thus not included with this Declaration. Such documents are available upon request by the Court or any interested party.

respect to the real property owned by 1290 Optical located at 1290 W. Optical Drive, Azusa, California 91702 (the "Optical DOT" and "Optical Drive Property", respectively), a blanket lien on all personal property owned by the Debtor, perfected by duly filed UCC-1 financing statement (the "UCC Lien"), and a stock pledge.

6. I understand that Adhara's UCC Lien is second in line only to the U.S. Small Business Association (the "SBA"), with original principal amount of $500,000, and potentially certain purchase money security interests in equipment purchased by the Debtor.

### C. Repeated Defaults and Delays

7. Jeffrey Crevoiserat, the Adhara Loan personal guarantor, possesses a 53.3% ownership share of Skylock Holdings, LLC through his ownership vehicle, Tech-Mar Capital LLC. Skylock Holdings, LLC has 100% ownership of the Debtor. *See* List of Equity Security Holders [Dkt. 48].

8. The Debtor defaulted on the Adhara loan almost immediately, failing to timely make required interest payments starting in October 2022, among other defaults. Myself and other members of the PPF team (the then-holder of the Adhara Loan) thereafter sought to engage in good faith negotiations and communications with the Debtor in order to achieve an orderly restructuring of the Adhara Loan. These efforts continued for approximately fifteen months and included workout proposals, waivers of loan covenants, allowance of payment delays, offers to assist in raising capital in exchange for equity rather than cash, and other concessions by PPF. Unfortunately, these efforts were repeatedly stymied by Mr. Crevoiserat's seeming refusal to engage in negotiations and communications in good faith or to allow the Debtor to fulfill its promises.

9. A pattern of delay emerged over the course of this time period whereby PPF's efforts to work with the Debtor and discuss potential workouts of the Adhara Loan were met with initial verbal agreements from Mr. Crevoiserat on behalf of the Debtor, but the Debtor's engagement would inevitably wane. In response to requests for financial records, Mr. Crevoiserat would show information on his laptop, assure myself and others on the PPF team that such information would

-3-
DECLARATION OF JASON SHLECTER IN SUPPORT OF ADHARA AEROSPACE AND DEFENSE, LLC'S MOTION TO DISMISS CHAPTER 11 CASE
CASE NO. 2:24-BK-17820-BB

be provided after a meeting, but it was never forthcoming. Indeed, despite repeated requests for financial disclosures and repeated promises by Mr. Crevoiserat that they were forthcoming, the Debtor failed to produce accurate and fulsome financial records that were required to be produced pursuant to the Adhara Loan Documents and that PPF (and its successors) would understandably need to assess the various work out options. On the rare occasion financial records were produced, such records were inconsistent with historical records and with records Mr. Crevoiserat would produce to other parties.

10. On or about January 1, 2024, the parties entered into a Forbearance Agreement with respect to the Adhara Loan pursuant to which the Debtor acknowledged the existence of nine (9) specified events of default and PPF agreed to hold off on pursuing its rights and remedies in order to allow the Debtor to seek a sale of assets or refinancing transaction that would result in funds sufficient to pay off the outstanding obligations under the Adhara Loan. The Forbearance Agreement was terminated January 23, 2024 due to payment default, despite the payment amount being reduced from its originally scheduled amount.

11. In the presence of other shareholders of the Debtor, Mr. Crevoiserat verbally agreed to the terms of an amended forbearance agreement. We thus went through extensive drafting of an amended forbearance agreement in February and March 2024, but Mr. Crevoiserat, as the Debtor's signatory, ultimately declined to sign, despite his prior agreement and, more important, despite the financial relief such amended forbearance agreement would provide the Debtor.

12. On March 1, 2024, PPF retained Oakwood Business Associates, LLC, a consultancy owned and operated by William Baribault. Mr. Baribault has significant aerospace turnaround experience and was retained to provide guidance to the Debtor on how to better manage operations. Mr. Baribault executed a non-disclosure agreement as a condition of his work. Mr. Baribault attempted to fulfill his duties under the consulting agreement, but was ultimately hindered by Mr. Crevoiserat who refused to work with him or consider his suggestions for turning around the Debtor.

13. On March 18, 2024, PPF advanced $50,000 to the Debtor so that it could fund its payroll and operations in general.

14. Notwithstanding termination of the Forbearance Agreement, PPF did not immediately exercise its remedies. Instead, we continued in good faith to attempt to negotiate a consensual work out of the Adhara Loan. The Debtor, under the direction of Mr. Crevoiserat, refused to engage in such efforts in good faith and persisted in its pattern of delay and not providing financial documents to PPF.

15. As a result, in or around March 2024, PPF advised the Debtor that it intended to proceed with a foreclosure with respect to the Optical Drive Property. We continued to attempt to negotiate a consensual work out of the Adhara Loan, but were met with delay and resistance from the Debtor.

16. On or about April 4, 2024, I understand that Spirit AeroSystems, Inc. ("Spirit") advised the Debtor that it was terminating all of its contracts with the Debtor and asserted that as a result of the Debtor's defaults under such contracts, the Debtor owed Spirit an amount in excess of $13 million. I also understand that, prior to termination of the Spirit contracts, Spirit had been the Debtor's most significant customer. *See* Debtor's Chapter 11 Status Conference Report [Dkt. 68] at 1.

17. On May 21, 2024, at PPF's direction, the trustee appointed pursuant to the Optical DOT issued a formal Notice of Trustee's Sale to 1290 Optical which informed it that a public sale would be conducted with respect to the Optical Drive Property on June 20, 2024 (the "Optical Drive Sale").

18. Mr. Crevoiserat advised us that there were parties interested in purchasing the Optical Drive Property, but he failed to make meaningful progress with these interested parties because he could neither provide credible tenant financials nor provide comfort around various property-related issues. We were able to connect with one "potential buyer" who advised PPF that they could not work with Mr. Crevoiserat because he failed to provide sufficiently detailed

information after an initial call. We encouraged Mr. Crevoiserat to have the interested parties attend the Optical Drive Sale. None did.

19. On June 20, 2024, PPF executed an Assignment of Notes and Liens in favor of PPL Optical Holdings, LLC ("PPL Optical"), a then-newly formed affiliate of PPF, pursuant to which the Adhara Loan Documents were assigned by PPF to PPL Optical, including the Optical DOT (the "PPL Assignment"). As is customary in this context, PPL Optical was formed to own the Optical Drive Property in the event it was the successful bidder at the Optical Drive Sale since PPF is a lender and not in the business of owning and operating real property.

20. On June 20, 2024, the trustee conducted the duly noticed Optical Drive Sale. No one aside from representatives of PPL Optical appeared at the Optical Drive Sale and, accordingly, PPL Optical credit bid $5,000,000 for the Optical Drive Property.

21. On June 21, 2024, the trustee executed a Trustee's Deed Upon Sale pursuant to which title to the Optical Drive Property was transferred to PPL Optical (the "Optical Drive Deed").

22. On June 25, 2024, the PPL Assignment and the Optical Drive Deed were recorded in the Official Records of the Recorder's Office, Los Angeles County, California on June 25, 2024 at 8:00 a.m. and assigned document identification nos. 20240410130 and 20240410131, respectively.

23. After closing the Optical Drive Sale, we discovered that, in further breach of the Loan Documents, 1290 Optical was delinquent in its payment of real property taxes assessed against the Optical Drive Property in excess of $200,000. PPL Optical has since paid those delinquent real property taxes, thereby further increasing the magnitude of the amount owed under the Adhara Loan.

24. As the new owner of the Optical Drive Property, and as a further demonstration of its good faith, PPL Optical offered to lease the Optical Drive Property to the Debtor on a month-to-month basis for just $50/month (plus utilities, taxes, and maintenance costs) even though the fair market rent would be closer to $50,000/month. The Debtor accepted the lease terms and has occupied the Optical Drive Property subsequent to the public sale.

25. In addition to agreeing to extraordinarily below-market lease of the Optical Drive Property, we continued our good faith efforts to achieve a workout of the Adhara Loan with the Debtor. This included an all-hands call that I attended with the Debtor's shareholders on June 27, 2024 during which Mr. Crevoiserat verbally agreed to a strict foreclosure on the Debtor's assets in exchange for a waiver and release of claims PPL Optical had against Mr. Crevoiserat personally, including claims arising from his guaranty of the Adhara Loan. But as had repeatedly been the case, once PPL Optical expended significant time and energy in drafting the appropriate legal agreement, Mr. Crevoiserat walked away from these promises.

26. On September 16, 2024, PPL Optical executed an Assignment of Notes and Liens in favor of Adhara, a newly formed affiliate of PPF, pursuant to which the Adhara Loan Documents were assigned by PPL Optical to Adhara, including the UCC Lien.

27. On September 16, 2024, Adhara issued a Notification of Disposition of Collateral pursuant to which it notified the Debtor, Mr. Crevoiserat, and other parties with interest in the collateral that Adhara would conduct a public foreclosure sale of the Debtor's personal property subject of the UCC Lien (the "UCC Collateral") on September 27, 2024 (the "UCC Sale").

28. As is customary in this context, Adhara was formed to own and operate the UCC Collateral in the event it was the successful bidder at the UCC Sale. Indeed, Adhara was positioned to ensure that operation of the Debtor's business would transition as smoothly as possible following the UCC Sale, both as a means of maximizing the value of Adhara's collateral and to avoid the loss of at least 30 jobs and customers of the business. This included setting up payroll, insurance, health care benefits, and Quickbooks accounts to ensure operation of the assets happened as seamlessly as possible. It was never PPF's or its successors' intent to own or operate the Debtor's business, and this is not something PPF has ever had to do with one of its borrowers, but when faced with utter refusal to work in good faith toward a solution, PPF and its successors were compelled to act to save this business and their investment in such business.

29. Both prior to and after issuance of the Notification of Disposition of Collateral, we engaged in concerted marketing efforts with respect to the UCC Collateral. These efforts include

-7-

contacting twenty-eight third parties that may be interested in buying all or part of the UCC Collateral, entering into non-disclosure agreements and providing more detailed information to eleven such parties, and providing site visits to five interested parties. I anticipated that there would be active bidding at the UCC Sale.

### D.  Concerns Regarding Mr. Crevoiserat's Involvement

30.  Through mine and my colleagues prepetition dealings and interactions with Mr. Crevoiserat as the Debtor's representative, we observed that, prior to the bankruptcy, the Debtor's valuation of its inventory fluctuates greatly without justification or substantiation, going as low as $1 million to as high as $8 million in the span of just the previous year, depending on which party was on the receiving end of the purported valuation.

31.  Upon information and belief, Mr. Crevoiserat used the Debtor's corporate funds to pay for his personal vacation and other personal expenses at least three separate times from December 2023 onwards. Alarmingly, at least one of such withdrawals resulted in the Debtor needing an urgent infusion of additional cash just to be able to make payroll.

32.  In addition, Jim Pease, the Debtor's CEO and person in charge of day-to-day operations of the company and lead engineer, has a very strained relationship with Mr. Crevoiserat. Over the last year, Mr. Pease contacted my colleagues at PPF to advise that he was seriously considering resigning as a result of this tension and concerns about Mr. Crevoiserat's leadership.

33.  Subsequent to the bankruptcy filing, Mr. Pease has continued to reach out to my colleagues to discuss the status of the Debtor's operations, particularly focused on the Debtor's cash position, ability to make payroll and pay critical bills, sales numbers, and purchases of new inventory. These communications are one directional, that is to say, neither myself or any of my colleagues contact Mr. Pease, but he calls and we take these calls. We do not make any demands for payment or otherwise solicit information from Mr. Pease, he simply shares it and we listen. We understand that Adhara is not permitted to make demand for payment if and when Mr. Pease reaches out, and we have and will continue to comply with that limitation.

34. Given the importance of Mr. Pease's role in the functioning of the Debtor, we have grown increasingly concerned about Mr. Crevoiserat's role and Mr. Pease's ability to run the company with little or no working capital to buy inventory to fulfill customer orders as well as to retain staff to maintain a going concern.

35. While Mr. Crevoiserat periodically holds himself out of the chief financial officer of the Debtor, during the meeting of creditors (which I attended), Mr. Crevoiserat testified on behalf of the Debtor and was unable to answer the simplest of financial questions, such as "what is your gross margin" and "what percentage of your revenues did Spirit represent?" These are the types of questions that most of the Debtor's line management would be able to answer off the tops of their heads without having to refer to the Debtor's books and records. Mr. Crevoiserat could not.

**E.    The Bankruptcy**

36. On September 26, 2024, in order to prevent the UCC Sale from going forward, the Debtor filed its voluntary chapter 11 petition [Dkt. 1] (the "Petition") in the United States Bankruptcy Court for the Central District of California (the "Court").

37. In our opposition to the Cash Collateral Motion, we flagged a variety of the Budget line items as needing additional explanation, including an auto expense of $1,071/week. Cash Collateral Opp. at 9. In response, the Debtor filed the supplemental declaration of Mr. Crevoiserat in support of the Cash Collateral Motion [Dkt. 26] (the "Cash Collateral Supp. Decl."). Mr. Crevoiserat attested, under penalty of perjury that the auto expense "relates to the use of Mr. Pease's car, which he graciously allows the Company to use for regional deliveries to customers." Cash Collateral Supp. Decl. ¶ 3.C. In fact, as Mr. Pease, attested at the first day hearing on October 1, 2024 that he allows the Debtor to use two of his vehicles, one of which is fully paid off and the other he pays for personally, to the tune of about $1,000/month. *See* Audio File from October 1, 2024 Hearing [Dkt. 50]. According to Mr. Pease, there are no automobile expenses outside of gasoline. *Id.* Adhara has not received any explanation of these discrepancies.

38. Subsequent to the first day hearing, we received a copy of what Mr. Crevoiserat purported were the Debtor's historical records of quarterly expenses for 2023 year (the "2023

Expenses"), a copy of which is appended hereto as **Exhibit A**. According to Mr. Crevoiserat, many of the Original Budget line items were estimated based on the 2023 Expenses, *see* Cash Collateral Supp. Decl. ¶ 3, but the numbers do not neatly line up in that regard. Rather, Mr. Crevoiserat appears to have reduced a number of the expenses from what was incurred in 2023, such as health care expenses, utilities, and shipping costs. However, the precise reasons for those reductions and the formula – if any – applied for those reductions remains unclear. In comparing the 2023 Expenses with the Original Budget, a disconnect exists between the historical data and the Original Budget.

39. In addition to questioning certain expenses in the Budget, in its Cash Collateral Opposition, Adhara highlighted the omission of certain significant creditors from the list of twenty largest unsecured creditors and creditor matrix, most egregious of which being Spirit and its $13 million claim which was a catalyst of this bankruptcy case notwithstanding the Debtor's attempts to place all blame on Adhara. The Debtor attempted to rectify this omission by filing an amended list of twenty largest unsecured claims and an updated creditor matrix, but the original omission remains unexplained. *See* Dkt. 48.

40. In Schedule A/B, the Debtor disclosed having cash of just $6,601.60 as of the September 26, 2024 petition date. I understand from Mr. Crevoiserat's testimony at the meeting of creditors, that this figure is not accurate and does not include certain funds used to fund prepetition payroll, but the Debtor also indicated at the meeting of creditors that it did not intend to amend its Schedules to correct the error.

41. Based on proof of claim no. 4 filed on November 1, 2024 by the Internal Revenue Service, the Debtor has at least another $145,330.52 in priority tax debt that is not included in the Schedules.

42. In the Supplemental Crevoiserat Decl., Mr. Crevoiserat attests under penalty of perjury that the Debtor has reduced its short-term sales projections by 20% to account for the Boeing strike while simultaneously acknowledging that such strike commenced on September 13, 2024 – almost two weeks before the Original Budget was submitted to this Court. Supp. Crevoiserat Decl. ¶ 7(a). Mr. Crevoiserat further attests that the Debtor is holding approximately $250,000 in

finished goods as a result of the Boeing strike. *Id.* ¶ 7(b). It is not clear whether these finished goods comprise all or a portion of the "unknown" finished goods disclosed in Schedule A/B.

43. Mr. Crevoiserat goes on to explain that "[t]he Debtor is holding significant amounts of intermediate assemblies that require some added materials or outside processing that the Debtor has been unable to fund while transitioning to bankruptcy. The Debtor expects to complete these items upon approval of usage of cash collateral." *Id.* ¶ 8. The foregoing implies that the Debtor did not have sufficient cash on hand to fund these purchases even though they were projected as expenses in the Original Budget.

44. It is my understand that chapter 11 debtors frequently request approval of debtor-in-possession financing to ensure smooth operations in bankruptcy. It is notable that with just $6,601 in cash on hand, the Debtor has not sought such financing in this case. Based on my work on this matter, my review of the Schedules and SOFA and other documents relating to the Debtor's financial affairs, and discussions internally and with counsel, it appears that the Debtor has been unable to pay its ongoing expenses for quite some time, a fact borne out by the fact that the Debtor came into this bankruptcy case with over $24 million in unsecured debt and as a defendant nine actions as of the filing date, the majority of which appear to be premised on a failure to pay.

45. On October 21, 2024, the Debtor filed a further updated budget [Dkt. 54] (the "Further Updated Budget") which purports to reflect actual results through week ending October 12, 2024 – it is not clear whether the week ending October 12 results are an aggregation of the first two weeks in bankruptcy, or just that particular week. The Further Updated Budget notably does not include results for week ending October 19, 2024, even though that week had passed by the time of its filing. Adhara has asked, through counsel, for the actual weekly results, starting with week ending October 5, 2024, but to date, has not been provided with that information notwithstanding its importance to the merits of the Cash Collateral Motion.

46. The Original Budget projected that the Debtor would have $59,176 net cash on hand as of October 12, 2024, but the Further Updated Budget reflects that the actual net cash as of October 12, 2024 was just $2,318 – less than 4% of what was projected.

-11-
DECLARATION OF JASON SHLECTER IN SUPPORT OF ADHARA AEROSPACE AND DEFENSE, LLC'S MOTION TO DISMISS CHAPTER 11 CASE
CASE NO. 2:24-BK-17820-BB

47. The total expenses for the week ending October 12, 2024 were projected to be $92,700 in the Original Budget, but ended up being $156,493 – a 69% increase. What is particularly concerning about this disconnect between collections and expenses is the fact that a number of the projected expenses from the Original Budget were not actually paid during this initial period, suggesting that over time, the expenses are only going to further outpace collections. Indeed, the Debtor has served notices of proposed insider compensation which totals more than $13,000/week, more than $1,000 in excess of what is reflected in the each of the Budgets. Plus there are the administrative costs of this case which I understand are likely to be significant. And while the Debtor has repeatedly suggested it would be selling equipment and a proposal for doing do was forthcoming, none have materialized.

48. One particularly worrying expense that was projected in the Original Budget, but was not paid is the $30,000 for restock raw materials. It is Adhara's understanding that as a result of not purchasing such raw materials, the Debtor was not able to restock certain inventory to sell to customers thereby hampering its ability to generate sales and collections.

49. In its further opposition to the Cash Collateral Motion [Dkt. 59] ("<u>Adhara's Further Cash Collateral Opp.</u>"), Adhara highlighted the foregoing issues and certain expenses that were out of the allowed 15% variance when comparing the Original Budget and the Further Updated Budget.

50. We sought, through counsel, explanations and information to explain these variances and to review the information and documents supporting the Further Updated Budget. Adhara's counsel, Rachel Stoian, has forwarded along both our requests and the Debtor's responses, all of which are contained in an email thread that relates solely to the Debtor's financial affairs – a topic that I understand is an open book now that the Debtor is in bankruptcy. While we have authorized Ms. Stoian to discuss potential workout or settlement terms with Debtor's counsel, those communications have taken place in separate email correspondence and over the telephone.

51. As part of the communications regarding the Budgets, the Debtor provided, through counsel, a compilation of documents annexed hereto collectively as **Exhibit B**. The Debtor provided certain additional schedules of inventories that are not includes with this declaration, but

-12-

available upon request. Unfortunately, the documents provided left many of our questions unanswered.

52. In its reply in further support of the Cash Collateral Motion [Dkt. 67] (the "Debtor's Cash Collateral Reply"), the Debtor has not provided any clarity. As it relates to the Budget line items out of variance, the Debtor provides convoluted responses that stretch the bounds of credulity when the Debtor's actual filings are considered.

53. As it relates to Non-Insider Payroll, Adhara pointed out that in the Original Budget, this expense was projected to be $9,500 in the week ending October 12, but the Further Updated Budget reflects that it was $39,350. In response to Adhara pointing this out, the Debtor suggests that the $39,350 is an aggregate the Non-Insider Payroll and Manufacturing Wages lines items and also somehow that it represents three weeks of payroll. The numbers do not add up. There is a separate line item of $53,193 for Manufacturing Wages in the Further Updated Budget, but according to the Debtor that figure is somehow included in the $39,530 amount and shown in the chart summarizing expenses for the period of September 27 through October 14 (the "Summary Chart") in the Debtor Cash Collateral Reply. The dates and numbers in that Summary Chart do not line up in any comprehensible fashion with what is reflected in either the Original Budget or the Further Updated Budget. Indeed, there is no indication from the Further Updated Budget that the first two weeks' results were combined and it seems that perhaps the Debtor only asserts as much when it benefits the Debtor.

54. The Debtor has dragged its feet in producing fulsome documentation to support its receipts and disbursements which is in keeping with the Debtor's behavior prior to this bankruptcy.

55. Adhara also flagged the variance in raw materials purchases, noting that they were projected to be $6,795 and were actually $9,634. The Debtor points out that the Original Budget allowed $36,765 for raw materials, so it was well within Budget. This ignores the fact that the Original Budget includes the following text in red in the raw materials line: "Includes $30,000 restock." The Further Updated Budget splits the raw materials line items into raw materials and raw materials restock, but the Debtor attempts to ignore that.

-13-
DECLARATION OF JASON SHLECTER IN SUPPORT OF ADHARA AEROSPACE AND DEFENSE, LLC'S MOTION TO DISMISS CHAPTER 11 CASE
CASE NO. 2:24-BK-17820-BB

56. As it relates to the substantial variance between the Original Budget and the Further Updated Budget with respect to outside processing, the Debtor once again points to the Summary Chart, making an accurate comparison essentially impossible based on the information supplied by the Debtor. The reality is that when you compare line items in the Original Budget and the Further Updated Budget, the variance exceeds what is allowed in the Interim Cash Collateral Order.

57. Meanwhile, the few documents that the Debtor has provided do not comport with the Debtor's filings. One document reflected a $16,000 rental payment on October 1, but that is nowhere reflected in the Further Updated Budget and no explanation has been provided. *See* Exhibit 3 at 5. The answer to this question appears to have arrived on November 1, 2024, when the relevant landlord filed a motion for relief from stay alleging that the Debtor had not made any postpetition rental payments. *See* Dkt. 70 at 8.

58. Mr. Crevoiserat has indicated in both emails from the Debtor's counsel and at the meeting of creditors that an audit of the Debtor's inventory was forthcoming, but it has not yet been provided. This would help Adhara and all interested parties understand the true value of the Debtor's inventory which comprises a very significant proportion of its collateral. As of right now, the parties simply have no choice but to rely on the Debtor's estimates. Given the Debtor's track record when it comes to numbers, that gives me and my colleagues little confidence.

59. At the meeting of creditors held on October 28, 2024, Mr. Crevoiserat testified on behalf of the Debtor that the Debtor had $21,730.59 in cash on hand – a startlingly low amount given the expenses associated with operating the Debtor's business. Mr. Crevoiserat further confirmed that he prepared the Budgets himself.

60. I have reviewed Mr. Crevoiserat's declaration in support of the Debtor's Chapter 11 Status Conference Report in which he attests that the Debtor's aggregate secured debt from the SBA, equipment lenders, and Adhara to be $5,845,933, but aggregate collateral value is only $5,856,164. *See* Declaration of Jeffrey B. Crevoiserat in support of Debtor's Chapter 11 Status Conference Report [Dkt. 68] (the "Crevoiserat Status Conf. Decl.") at 2 & 4. Thus according to the

Debtor's own numbers – attested to by Mr. Crevoiserat under penalty of perjury – the Debtor's assets have only $10,231 in equity cushion available to protect secured creditors' interests.

61. As of the execution of this declaration, the Boeing strike is ongoing and there are no clear signs of it stopping. The Debtor has some sales and income, but its expenses are outpacing cash collateral, and creditors need more than the hope of the strike ending to rely on for adequate protection.

I declare under penalty of perjury that the foregoing is true and correct, executed this 4th day of November, 2024, at Santa Monica, California.

_____
Jason Shlecter

-15-

DECLARATION OF JASON SHLECTER IN SUPPORT OF ADHARA AEROSPACE AND DEFENSE, LLC'S MOTION TO DISMISS CHAPTER 11 CASE

CASE NO. 2:24-BK-17820-BB