JEFFREY S. SHINBROT, ESQ. (SBN 155486)
jeffrey@shinbrotfirm.com
JEFFREY S. SHINBROT, APLC
15260 Ventura Blvd., Suite 1200
Sherman Oaks, CA 91403
Telephone: (310) 659-5444
Fax: (310) 878-8304
Reorganization Counsel for Debtor-In-Possession

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION**

| | |
|---|---|
| In re<br><br>SKYLOCK INDUSTRIES INC.<br><br>Chapter 11 Debtor and Debtor-In-Possession | Case Number: 2:24-bk-17820-BB<br><br>Chapter 11<br><br>**SUBMISSION OF ASSET PURCHASE AGREEEMENT.**<br><br>Date: March 12, 2025<br>Time: 1 :00 p.m.<br>Place: 255 East Temple Street, Los Angeles, CA90012 Courtroom 1539 |

**TO THE HONORABLE SHERI BLUEBOND, UNITED STATES BANKRUPTCY JUDGE AND TO ALL PARTIES ON THE ANNEXED SERVICE LIST**: **COMES NOW,** SKYLOCK INDUSTRIES, the debtor and debtor-in-possession in the above entitled Chapter 11 proceeding (“Debtor”), hereby submits the fully executed Asset Purchase Agreement (the “APA”) in support of the Debtor’s Motion For Order: (1) Approving Asset Purchase Agreement; (2) Approving The Sale Of Substantially All Assets Of The Debtor; (3) Approving Overbid Procedures filed at ECF Dkt. No.208.

The APA is annexed hereto as Exhibit 4.

Dated: March 5, 2025

JEFFREY S. SHINBROT, APLC

By:______________________________
JEFFREY S. SHINBROT, ESQ.
Bankruptcy Counsel to Skylock Industries

EXHIBIT 4

**ASSET PURCHASE AGREEMENT**

By and Among

Skylock Industries,

as the Seller

and

Adhara Aerospace & Defense LLC,

as the Buyer

Dated as of [__], 2025

ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement") is made and entered into as of February [_], 2025, by and between Adhara Aerospace & Defense LLC, a Delaware limited liability company ("Buyer"), and Skylock Industries, a California corporation (the "Seller," and together with Buyer, the "Parties").

RECITALS

A. WHEREAS, the Seller is engaged in the design, production and sale of operating aerospace hardware for both commercial and military applications (such business as conducted by Seller, the "Business").

B. WHEREAS, the Seller filed a voluntary petition (the "Chapter 11 Case") under chapter 11, title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court") on September 26, 2024 (the "Petition Date").

C. WHEREAS, prior to the Petition Date, Buyer's predecessor, Pasadena Private Finance, LLC ("PPF") provided financings (the "Adhara Loan") to Seller pursuant to a certain loan agreement (the "Loan Agreement") by and between PPF, Seller, 1290 Optical Drive LLC and certain guarantors, secured by all of the assets of the Seller pursuant to a deed of trust including (1) real property owned by 1290 Optical located at 1290 W. Optical Drive, Azusa, California 91702 ("the "Optical DOT" and "Optical Drive Property", respectively), (2) a blanket lien on all personal property owned by the Seller, perfected by a UCC-1 financing statement (the "UCC Lien") and (3) a stock pledge by and among the Seller and Buyer (the "Security Documents," and together with the Loan Agreement the "Adhara Loan Documents").

D. WHEREAS, on June 20, 2024, PPF executed an Assignment of Notes and Liens in favor of PPL Optical Holdings, LLC ("PPL Optical") pursuant to which the Adhara Loan Documents were assigned by PPF to PPL Optical, including the Optical DOT and, on September 16, 2024, PPL Optical executed an assignment of notes and liens in favor of the Buyer pursuant to which the Adhara Loan Documents were assigned by PPL Optical to the Buyer, including the UCC Lien.

E. WHEREAS, Buyer's affiliate Pasadena Private Lending Inc. possesses an administrative claim arising from its advance of funds to Seller after the Petition Date for the payment of the premium associated with the Directors and Officers Liability Insurance Policy obtained by Seller's Chief Restructuring Officer (the "D&O Premium Claim").

F. WHEREAS, the Chief Restructuring Officer of the Seller has determined that, based upon its consideration of the available alternatives, and subject to the approval of the Bankruptcy Court and the provisions in this Agreement regarding the solicitation of and the ability to accept Alternative Transactions, a sale, assignment, and assumption of the Acquired Assets and Assumed Liabilities pursuant to this Agreement under Sections 363 and 365 of the Bankruptcy Code is in the best interests of such Seller.

G. WHEREAS, on or about February 14, 2025, Buyer and Seller executed a term sheet that serves as a foundation for this Agreement (the "Term Sheet").

H. WHEREAS, upon the terms and subject to the conditions set forth in this Agreement, and as authorized under Sections 363 and 365 of the Bankruptcy Code, the Seller proposes to sell and transfer, and Buyer proposes to buy and assume, substantially all of the assets and certain liabilities of the Seller (the "Asset Acquisition").

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and adequacy of which is hereby

acknowledged, and upon the terms and subject to the conditions hereinafter set forth, the parties hereto, intending to be legally bound hereby, agree as follows:

ARTICLE I.
THE TRANSACTION

1. Bankruptcy Court Approval. This Agreement and each and all of the terms set forth herein, are conditioned upon, and subject to, the approval of the Bankruptcy Court.

2. Purchase and Sale of Acquired Assets; Assumed Liabilities.

(a) Purchase and Sale of Acquired Assets. Subject to the terms and conditions hereof, at the Closing (as defined below), the Seller shall sell, convey, transfer, assign and deliver to Buyer, and Buyer shall purchase from the Seller, all of Seller's right, title and interest in and to all of Seller's property and assets, real, personal or mixed, tangible and intangible, of every kind and description, wherever located and whether or not any of such assets have any value for accounting purposes or are carried or reflected on or specifically referred to in either the Seller's books of account or financial statements, excluding only the Excluded Assets (the foregoing collectively, the "Acquired Assets"), free and clear of any and all Encumbrances other than Permitted Encumbrances, including all of the following:

(i) all trade and other notes and accounts receivable, advance payments, deposits (including deposits on inventory but excluding cash on hand, except as set forth below), prepaid items and expenses, deferred charges, rights of offset and credits and claims for refund;

(ii) any cash on hand after payment of the Carve-Out pursuant to Section 1.5;

(iii) all inventory of raw materials, work in process, parts, subassemblies and finished goods, wherever located and whether or not obsolete or carried on the Seller's books of account (including but not limited to such personal property listed by the Seller in Schedule A/B of its bankruptcy schedules), in each case with any transferable warranty and service rights of the applicable Seller with respect to such Acquired Assets;

(iv) all fixed assets and other personal property and interests therein, wherever located, including all vehicles, tools, parts and supplies, fuel, machinery, equipment, furniture, furnishing, appliances, fixtures, office equipment and supplies, owned and licensed computer hardware and software and related documentation (including any source code or systems documentation associated therewith), stored data, communication equipment, physical embodiments of Intellectual Property, trade fixtures and leasehold improvements, in each case with any transferable warranty and service rights of Seller with respect to such Acquired Assets;

(v) all rights, remedies and benefits of Seller arising under or relating to any of the Acquired Assets, the Assumed Liabilities or the Business, including, without limitation, rights, remedies and benefits arising out of express or implied warranties from manufacturers or suppliers of the equipment or the inventory of Seller (or components thereof), the other Acquired Assets or products purchased or ordered by Seller prior to the Closing Date (and in any case, any component thereof), and all claims and causes of action arising therefrom;

(vi) all rights under the Contracts listed on Schedule I.2(a)(vi), which Contracts shall be assumed by Seller and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code, the Sale Order or by other order of the Bankruptcy Court (collectively, the "Assumed Contracts");

(vii) telephone and fax numbers;

(viii) all goodwill, other intangible property, and causes of action, choses in action, causes of action, judgments, actions, claims and rights of any kind, including but not limited to any of the foregoing Seller has listed in Seller's Schedule A/B filed in the Chapter 11 Case or that Seller has or may have against any lender (whether by contract, tort, fiduciary duty or otherwise) relating to any of the Acquired Assets (including the Intellectual Property), the Assumed Liabilities or the Business, including any right, demand, claim, action or cause of action which constitutes an avoidance or preference action of the Seller's estate under Chapter 5 of the Bankruptcy Code and any other applicable provision of the Bankruptcy Code, solely as against Buyer and any of its affiliates, including any and all proceeds of the foregoing;

(ix) books, minute books, corporate records, books of account and records and originals of manuals, documents, correspondence, sales and credit reports, customer lists, literature, brochures, advertising or promotional material and the like, including complete copies of the books and records pertaining to the organization and existence of Seller retained pursuant to Section I.2(b)(v) below;

(x) all office supplies, production supplies, spare parts, other miscellaneous supplies, and other tangible property of any kind wherever located, including, without limitation, all property of any kind located in any building, office or other space leased, owned or occupied by Seller or in any warehouse where any of Seller's properties and assets may be situated;

(xi) the right to receive and retain mail, accounts receivable payments and other communications;

(xii) all Tax Returns to the extent of, or to the extent maintained for, the Acquired Assets or the Business, but excluding any such items to the extent (i) they are solely included in, or solely related to, any Excluded Assets or Excluded Liabilities or (ii) any Law prohibits their transfer;

(xiii) all indemnities;

(xiv) all trademarks, service marks and trade names of Seller and any logos, designs, symbols, trade dress or other source indicators associated therewith, any fictitious names, d/b/a's (including the ones set forth on Schedule I.2(a)(xiv)) or similar filings related thereto, or any variant of any of them, all business goodwill associated therewith and any applications therefor or registrations thereof, and any other forms of technology, intangibles, know-how, Intellectual Property or industrial property rights, including any patents, trade secrets, proprietary manufacturing processes, copyrights, rights of publicity, and any licenses, consents or other agreements relating thereto;

(xv) all domains owned by Seller or to which Seller has any rights, including http://skylock.com and those other domains set forth on Schedule I.2(a)(xv);

(xvi) all websites owned by Seller or to which Seller has any rights, including all blogs, fan pages, pages on facebook.com and pages on twitter.com including http://skylock.com and related local websites, including those set forth on Schedule I.2(a)(xvi);

(xvii) all content of any kind or nature (including video, images and text) contained on Seller's websites or elsewhere to which Seller has any rights and all databases, data, and metadata stored, resident or collected by computer and web-based systems of Seller to which Seller has any rights;

(xviii) all indoor and outdoor signage, advertising, promotional materials, décor pieces, accents and artwork or decorations (including, in each case, all Intellectual Property rights and benefits relating to the foregoing);

(xix) any Permits to the extent their transfer is permitted by applicable Law;

(xx) all Tax assets, to the extent permitted to be transferred by applicable Law;

(xxi) all refunds of Taxes (or rights to refunds of Taxes, whether claimed or unclaimed) for all taxable periods (or portions thereof), excluding the amount of any refunds of Taxes necessary to offset any claims for Taxes against the Seller or the Seller's bankruptcy estate;

(xxii) all of Seller's rights to receive refunds, payments or overpayments, clawbacks or other amounts (whether from a workers' compensation administrator or otherwise) in respect or any and all workers' compensation matters, claims, potential claims, purported claims and similar related items; ;

(xxiii) all insurance policies and benefits, including insurance rights and proceeds and including any accounts receivable credit insurance policy, rights and proceeds; and

(xxiv) all other property and assets pertaining to or used or useful in the conduct of the Business or the ownership of any of the Acquired Assets and all other tangible and intangible assets that are not expressly identified as Excluded Assets.

Notwithstanding anything herein to the contrary, from and after the Closing and until the resolution of any administrative or judicial action against Seller currently pending as of the Closing, Buyer shall provide Seller with access to the books and records relating to the Acquired Assets on reasonable notice.

(b) <u>Excluded Assets</u>. Notwithstanding anything herein to the contrary, from and after the Closing, the Seller shall retain all of its right, title and interest in and to, and there shall be excluded from the sale, conveyance, assignment or transfer to Buyer hereunder, and the Acquired Assets shall not include, solely the following assets and properties (such retained assets and properties being the "<u>Excluded Assets</u>"):

(i) all Contracts that are not Assumed Contracts;

(ii) any cash on hand to the extent Seller's total cash on hand amounts to less than $300,000 as of the Closing pursuant to Section I.6;

(iii) any right, demand, claim, action or cause of action which constitutes an avoidance or preference action of the Seller's estate under Chapter 5 of the Bankruptcy Code and any other applicable provision of the Bankruptcy Code, including any and all proceeds of the foregoing, as against any and all parties or Persons other than Buyer and any of its affiliates;

(iv) all rights under this Agreement and any Ancillary Agreement;

(v) the books and records pertaining to the organization and existence of Seller;

(vi) any right or asset otherwise included in the Definition of Acquired Assets that Buyer elects, by written notice to Seller at any time before Closing, to exclude from the Acquired Assets and treat as an Excluded Asset; *provided, however*, that any such election or designation by the Buyer shall not reduce the Purchase Price;

(vii) any and all documents and records of the Seller that are subject to privilege, including, without limitation, attorney-client privilege, attorney work product, and/or other privilege;

(viii) any and all claims against any officer or director of the Seller; and

(ix) any and all refunds of Taxes (or rights to refunds of Taxes, whether claimed or unclaimed) up to the amount necessary to offset any claims for Taxes against the Seller or the Seller's bankruptcy estate.

(c) <u>Assumed Liabilities</u>. Subject to the terms and conditions hereof, at the Closing, Buyer shall assume and agree to fully pay, discharge, satisfy and perform, the following liabilities and obligations of

Seller, except in each case to the extent any such liabilities or obligations (a) would have been performed, paid or otherwise discharged on or prior to the Closing Date, but for a breach or default by Seller or (b) are Excluded Liabilities (the "Assumed Liabilities"):

(i) all of the liabilities and obligations of Seller (including Cure Costs) arising under or relating to any Assumed Contract;

(ii) secured debts or obligations to the extent such secured debts or obligations are attached to any of the Acquired Assets and superior to Buyer's lien on the Acquired Assets;

(iii) all of the liabilities and obligations of Seller relating to the administrative claim of William L. Neiman, individually, and The Neiman Family Trust relating to the Lease of the real property located at 1617 Avenue Padilla, Irwindale, CA 91702, but solely up through the Closing Deadline;

(iv) all of the liabilities and obligations of Seller relating to the administrative claim of PPL Optical Holdings, LLC relating to the Lease of the Optical Drive Property;

(v) up to $100,000 in outstanding post-Petition Date accounts payable of the Seller, exclusive of administrative claims relating to insider compensation or estate professionals and the D&O Premium Claim and identified by Seller within thirty (30) days of Closing;

(vi) all liabilities related to the Buyer's use of the Acquired Assets after the Closing (it being acknowledged that such Assumed Liabilities shall not include any liabilities or obligations arising out of events or circumstances existing as of or occurring prior to the Closing Date other than obligations arising after the Closing Date under the Assumed Contracts).

(d) Excluded Liabilities. Notwithstanding anything contained herein to the contrary, the Excluded Liabilities shall not be assumed and are disclaimed by Buyer, but instead shall be retained, performed, paid or discharged by Seller. The term "Excluded Liabilities" as used herein means any and all liabilities or obligations of Seller or any of its affiliates of any nature, whether due or to become due, whether accrued, absolute, contingent or otherwise, existing on the Closing Date, or arising out of any transactions entered into or any state of facts existing, or the use, ownership, possession or operation of the Acquired Assets or the conduct of Seller's Business prior to the Closing Date, excepting only the Assumed Liabilities; provided however that without limiting the foregoing, the Excluded Liabilities shall include the following:

(i) any liability of Seller for the Taxes of another person under a contractual indemnity or covenant, as a transferee or otherwise under applicable Tax Laws, regulations or administrative rules, and any other obligation or liability for Taxes related to the Acquired Assets or the Business arising in, or in connection with, a taxable period (or portion thereof) ending on or before the Closing Date;

(ii) any claim, obligation or liability in connection with or arising from or relating to any Excluded Asset, including any Taxes associated therewith;

(iii) any Debt;

(iv) any and all fees, costs and expenses (including legal fees and accounting fees) that have been incurred or that are incurred by Seller or in connection with the transactions contemplated by this Agreement or the Chapter 11 Case, including all fees, costs and expenses incurred in connection with or by virtue of (a) the negotiation, preparation and review of this Agreement (including the exhibits and schedules hereto) and all Ancillary Agreements, (b) the preparation and submission of any filing or notice required to be made or given in connection with any of the transactions contemplated by this Agreement, and the obtaining of any consent required to be obtained in connection with any of such transactions, and (c) the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements, including any retention

bonuses, "success" fees, change of control payments and any other payment obligations payable as a result of the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements;

(v) any obligation or liability of Seller to its equity holders (including holders of derivative securities, if any) respecting dividends, distributions in liquidation, redemptions of interests, option payments or otherwise;

(vi) any obligation or liability of Seller arising out of this Agreement and any Ancillary Agreement;

(vii) any obligation or liability arising out of or relating to any business or property formerly owned or operated by Seller, any affiliate or predecessor thereof, but not presently owned and operated by the Seller;

(viii) all liabilities relating to claims, actions, suits, arbitrations, Litigation matters, proceedings or investigations (in each case whether involving equity or debt holders of Seller, private parties, Authorities, or otherwise) involving, against, or affecting any Acquired Asset, the Business, Seller, or any assets or properties of Seller, whether sounding in contract, tort or otherwise, whether commenced, filed, initiated, or threatened before or after the Closing, relating to facts, events, or circumstances arising or occurring before the Closing;

(ix) all liabilities of Seller arising and to be performed prior to the Closing Date arising from or related to the Business or the Acquired Assets;

(x) all liabilities of Seller relating to actions, events, circumstances or conditions occurring or existing on or prior to the Closing Date;

(xi) any obligation or liability of Seller or its predecessors arising out of any contract, agreement, Permit, franchise or claim that is not transferred to Buyer as part of the Acquired Assets or, is not transferred to Buyer because of any failure to obtain any third-party or governmental consent required for such transfer;

(xii) any obligation or liability with respect to compensation, severance or benefits of any nature owed to any current or former employee, officer, director, member, partner or independent contractor of Seller or any ERISA Affiliate (or any beneficiary or dependent of any such individual), whether or not employed by Buyer or any of its affiliates after the Closing, that (A) arises out of or relates to the employment, service provider or other relationship between Seller or ERISA Affiliate and any such individual, including the termination of such relationship, (B) arises out of or relates to any Benefit Plan or (C) arises out of or relates to events or conditions occurring on or before the Closing Date; and

(xiii) any Environmental Liability.

3. Purchase Price; Payment. The aggregate purchase price (the "Aggregate Purchase Price") for the purchase, sale, assignment and conveyance of Seller's right, title and interest in, to and under the Acquired Assets will be FOUR MILLION FOUR HUNDRED FIFTY THOUSAND DOLLARS AND NO CENTS ($4,450,000), and shall consist of:

(i) a cash deposit of $150,000 (the "Cash Deposit");

(ii) a cash on hand carve-out of $300,000 (the "Carve-Out"); and

(iii) a credit bid of $4,000,000 (the "Credit Bid");

*plus* the assumption of the Assumed Liabilities and any Cure Costs associated with such executory contracts which are designated by Buyer for assumption.

4. Bulk Sales Laws. Buyer hereby waives compliance by Seller with the requirements and provisions of any “bulk-transfer” Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Transferred Assets to Buyer. Pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Transferred Assets shall be free and clear of any and all liens (as defined in Section 101(37) of the Bankruptcy Code), claims (as defined in Section 101(5) of the Bankruptcy Code, including, without limitation, claims for successor liability under any theory of Law or equity), interests, or Encumbrances, in each case pursuant to Section 363(f) of the Bankruptcy Code, whether arising prior to or subsequent to the Petition Date, including any liens or claims arising out of the “bulk-transfer” Laws.

5. Cash Deposit. upon the execution of the Term Sheet, Buyer shall have paid the Cash Deposit to Seller via wire transfer. The Cash Deposit may be utilized by Seller to fund operating expenses through the Closing in accordance with the budget approved by the *Order Authorizing: (1) Use of Cash Collateral on an Interim Basis; and (2) Setting Further Hearing on Use of Cash Collateral* [Dkt. 184], or any such cash collateral order entered subsequent to the execution of the Term Sheet and prior to the Closing Date. To the extent Buyer and Seller fail to execute this Agreement by the APA Deadline, the Bankruptcy Court enters a Denial Order, or the Asset Acquisition by Buyer does not close by the Closing Deadline, Seller shall repay Buyer an amount equal to the Cash Deposit within seven (7) days of the earlier of passage of the APA Deadline, entry of the Denial Order, and the Closing Deadline. Buyer’s right to repayment of an amount equal to the Cash Deposit shall be deemed an allowed superpriority administrative expense claim pursuant to Section 507(b) of the Bankruptcy Code.

6. Carve-Out. To the extent Seller’s cash on hand as of the Closing Date exceeds $300,000, the excess amount shall be turned over to Adhara at Closing. To the extent Seller’s cash on hand is less than $300,000, Buyer shall pay the Debtor the difference of Seller’s actual cash on hand and $300,000 (the “Carve-Out Deficiency”) at Closing. The Carve-Out may be used to pay administrative expenses (including the D&O Premium Claim) and unsecured claims against Seller’s bankruptcy estate.

7. Waiver of Deficiency. To the extent Buyer completes the Asset Acquisition and the Credit Bid is less than the total balance of the Adhara Loan as of the Closing Date, Buyer shall waive any right to an unsecured deficiency claim against Seller for the remaining balance of the Adhara Loan (the “Waiver”). Any such waiver shall be limited to Buyer’s claims against Seller in the Bankruptcy Case and is not, and shall not be construed as, a waiver or release of any claims Buyer may have against third parties or other Persons arising from or relating to the Adhara Loan, including, but not limited to, any guarantors of the Adhara Loan.

8. Competitive Bidding. Seller shall be permitted to solicit competing bids from Persons other than Buyer or its permitted transferee on the Acquired Assets (the “Competing Bid”). To be considered a qualifying bid as designated by Seller, any Competing Bid must exceed the Aggregate Purchase Price by at least $150,000 (the “Qualifying Bid”), and subsequent bidding increments shall be no less than $50,000. To the extent any Competing Bids are received and considered by Seller, Buyer shall be permitted to increase its Credit Bid up to the total amount of the Adhara Loan due and owing as of the date of receipt of any such Competing Bid. Seller may confirm the total amount due and owing on the Adhara Loan with Buyer in the event Seller designates any Competing Bids as Qualified Bids. The Parties agree that, as of December 31, 2024, the total amount of the Adhara Loan is no less than $5,563,341.

## ARTICLE II.
## CLOSING

1. Closing Date. The closing of the transactions contemplated hereby (the “Closing”) shall take place virtually or at the offices of Jeffrey S. Shinbrot, Esq., 15260 Ventura Blvd. Suite 1200, Sherman Oaks, CA 91403 beginning at 10 a.m. local time on the third Business Day after all of the conditions set forth in

Articles VII and VIII have been satisfied (other than those conditions which by their nature are only capable of being satisfied at Closing, but subject to the fulfillment or waiver of such conditions at the Closing) and within one week of the entry of a Sale Order, or at such other place, time, or date (including by the exchange of .pdf signature pages) as Buyer and Seller may mutually agree in writing (such time and date being referred to herein as the "Closing Date"). For financial accounting and tax purposes, to the extent permitted by Law, the Closing shall be deemed to have become effective as of the Closing Date (the "Effective Time").

2. Closing Deliveries.

(a) Deliveries by Buyer to Seller. At the Closing, Buyer shall deliver or cause to be delivered the following to Seller:

(i) the Waiver to the extent applicable pursuant to Section I.7;

(ii) the Carve-Out Deficiency to the extent applicable pursuant to Section I.6; and

(iii) any other transfer documents, as may reasonably be requested by Seller.

(b) Deliveries by Seller. At the Closing, Seller shall deliver or cause to be delivered the following to Buyer:

(i) a bill of sale in a form acceptable to Buyer;

(ii) assignment documentation for any patent applications, copyrights or domain names, which may be necessary to validly transfer such assets to Buyer;

(iii) any other transfer documents, as may reasonably be requested by Buyer;

(iv) a duly executed certificate from Seller prepared in accordance with Treasury regulations section 1.1445-2 and dated as of the Closing Date certifying that such Seller is not a foreign person; and

(v) such other agreements, certificates and documents as may be reasonably requested by Buyer to effectuate or evidence the transactions contemplated hereby.

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows:

1. Organization. Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware, and has all requisite corporate power and authority to carry on its business as it is now being conducted, and to execute, deliver, and perform this Agreement and each Ancillary Agreement to which it is a party, and to consummate the transactions contemplated hereby and thereby.

2. Authority. The execution, delivery, and performance by Buyer of this Agreement, and each Ancillary Agreement to which Buyer is a party, and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all necessary limited liability company action on the part of Buyer. This Agreement has been, and each Ancillary Agreement to which Buyer is a party will be at Closing, duly and validly executed and delivered by Buyer and constitutes, or will constitute, the valid and binding obligation of Buyer, enforceable against Buyer in accordance with its respective terms, except as such enforcement shall be limited by bankruptcy, insolvency, moratorium or similar law affecting creditors' rights generally and subject to general principles of equity.

3. No Conflict. The execution, delivery, and performance by Buyer of this Agreement and each Ancillary Agreement to which Buyer is a party, and the consummation by Buyer of the transactions contemplated hereby and thereby, does not and will not, with or without the giving of notice or the lapse of time, or both, (i) violate any provision of Law to which Buyer is subject or (ii) violate any provision of the limited liability company agreement or other governance documents of Buyer.

4. Consents. Except for the consent, approvals, authorization, exemptions or filings with Authorities in connection with the commencement of the Chapter 11 Case and the entry of the Sale Order, no consent, approval, or authorization of, or exemption by, or filing with, any Authority is required to be obtained or made by Buyer in connection with the execution, delivery and performance by Buyer of this Agreement or any Ancillary Agreement to which Buyer is a party.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer that, subject to entry of the Sale Order and except as set forth in the schedules hereto (whether pursuant to a schedule expressly referenced in respect of each representation and warranty or pursuant to a schedule generally addressing all such representations and warranties), as follows.

1. Authority. Seller is a corporation duly organized and in good standing under the laws of the State of California. Seller has all requisite power and authority to execute and deliver this Agreement as set forth in the Stipulation for Appointment of Chief Restructuring Officer and Order thereon in the Bankruptcy Case (collectively, the "CRO Order") and any Ancillary Agreements to which it is or shall, pursuant to this Agreement, be a party, and to perform, carry out and consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement and the Ancillary Agreements to which it is or shall, pursuant to this Agreement, be a party have been duly authorized by all necessary action on the part of Seller. This Agreement has been duly executed and delivered by Seller and constitutes the valid and legally binding obligation of Seller, enforceable against Seller in accordance with its terms, except as such enforcement shall be limited by bankruptcy, insolvency, moratorium or similar law affecting creditors' rights generally and subject to general principles of equity.

2. Title. To the Knowledge of Seller, Seller has good and marketable title to, or a valid interest in, all of the Acquired Assets and, upon the Closing will convey and transfer to Buyer all of the Purchased Assets, and Buyer shall receive good and marketable title to, or a valid interest in, all of the Purchased Assets free and clear of any Encumbrances, pursuant to Sections 105 and 363 of the Bankruptcy Code and any other applicable sections of the Bankruptcy Code and as set forth in the Sale Approval Order.

3. Brokers. To the Knowledge of Seller, Buyer has no liability or obligation to pay any broker, finder or investment banker, any brokerage, finder's or other fee or commission in connection with the origination, negotiation or execution of this Agreement or the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller for which Buyer could become liable or obligated.

4. Litigation. Except as set forth in Schedule IV.4, other than as disclosed in the Seller's Bankruptcy Case, to the Knowledge of Seller there is no Litigation, opposition, challenge, cancellation proceeding or investigation (collectively, "Actions") pending or, to the Knowledge of Seller, currently threatened against Seller or the Business or relating to the Purchased Assets, or that would prohibit Seller from entering into this Agreement or any Ancillary Agreement, or to consummate the transactions contemplated hereby or thereby, or that, to the Knowledge of the Seller, could result, either individually or in the aggregate, in any Material Adverse Effect. Other than is disclosed in the Bankruptcy Case, to the Knowledge of the Seller, there are no outstanding orders, writs, judgments, decrees, injunctions or settlements that restrict the Business or the Acquired Assets, including without limitation the Intellectual Property or the Assumed Contracts. Schedule

IV.4 sets forth the caption and summary description of all Actions to which Seller is a party or the Purchased Assets or the Business is subject.

5. Intellectual Property. Except as otherwise disclosed in Schedule IV.5, to the Knowledge of Seller, Seller owns and possesses all right, title and interest in and to all Intellectual Property used in the Business, there are no licenses or other grants of rights from Seller to any Person with respect to such Intellectual Property, and all Intellectual Property used in the Business shall be conveyed and transferred to Buyer free and clear of any Encumbrances, pursuant to Sections 105 and 363 of the Bankruptcy Code and any other applicable sections of the Bankruptcy Code and as set forth in the Sale Approval Order. Without limiting the foregoing:

(a) To the Knowledge of Seller, Schedules I.2(a)(xv) and I.2(a)(xvi)] set forth a true and complete list of (i) all domain names, websites and social media accounts, all of which are wholly owned by and/or registered to Seller and (ii) other than as set forth on Schedule IV.5(a), there are no copyrights, software, trademarks, patents, domain names or web sites used in connection with the Business that Seller has licensed or otherwise permitted to be used by other Persons.

(b) Except as set forth on Schedule IV.5(b):

(i) To the Knowledge of Seller, Seller owns all Intellectual Property used in connection with the Business and has valid rights in and to, including rights to use, publish, and perform, as applicable, all Intellectual Property included in the Purchased Assets as such Intellectual Property was used in the Business immediately prior to the Petition Date. To the Knowledge of Seller, no Person other than Seller has any ownership interest in, or a right to receive a royalty or similar payment with respect to, any of the Intellectual Property. Seller has not granted any options, licenses, assignments or agreements of any kind relating to ownership of rights in the Intellectual Property.

(ii) To the Knowledge of Seller, the Intellectual Property is not the subject of any ownership, validity, use, or enforceability challenge or claim received by Seller in writing or, to the Knowledge of Seller, any outstanding Final Order restricting the use by Seller or adversely affecting any of the rights of Seller thereto.

(iii) To the Knowledge of Seller, Seller has not entered into any agreement to indemnify any other Person against any charge of infringement with respect to any of Seller's Intellectual Property rights. Seller has not entered into any agreement which granted any third party the right to bring infringement actions or otherwise to enforce rights with respect to Intellectual Property or pursuant to which Seller has agreed not to sue or otherwise enforce any legal rights with respect to any of Seller's Intellectual Property rights.

(iv) To the Knowledge of Seller, no Person is violating any Intellectual Property.

(v) To the Knowledge of Seller, Seller is not violating and has not violated, any intellectual property rights of any other Person. There are no Actions pending or, the Knowledge of Seller, threatened, concerning any claim that Seller has infringed, diluted, misappropriated, or otherwise violated any intellectual property rights of any other Person.

(vi) To the Knowledge of Seller, Seller and its Affiliates have used commercially reasonable efforts to protect the confidentiality of any trade secrets, know-how and other confidential and proprietary information included in the Intellectual Property.

6. Contracts. No Assumed Contract, if any, has been orally modified or amended. Buyer shall have the right to designate additional executory contracts for assumption by Seller and assignment to Buyer at any time up to the Closing Date by written notice to the Seller. Upon receipt of such notice, the Seller

shall take all necessary steps to cause the Bankruptcy Court to approve the assumption by Seller and assignment to Buyer of such additional executory contracts provided, (i) approval of the assumption and assignment of such additional executory contracts shall not be a condition to Closing, (ii) failure of the Bankruptcy Court to approve such assumption and assignment shall not be a breach by Seller of its obligations hereunder.

7. Subsidiaries. Except as set forth on Schedule IV.7, Seller has no subsidiaries or any other equity or membership interest in any other Person.

8. Real Property. Seller does not own any real property. Schedule IV.8 contains a correct and complete list of each parcel of real property leased, subleased, licensed or occupied to or by Seller that is now, or at the time of Closing will be, used or held for use in or otherwise related to, or necessary for the conduct of, the Business ("Leased Real Property"),. Seller has made available to Buyer prior to the execution of this Agreement correct and complete copies of all leases set forth in Schedule IV.8 (including any amendments and renewal letters) to the Leased Real Property.

9. Insurance. Schedule IV.9 sets forth a complete and correct list of all insurance policies held by or on behalf of Seller relating to the Business and the Purchased Assets (including, without limitation, the Assumed Contracts), a brief description of such policies, and a description in reasonable detail of each claim made on such policies in the 12 months ended on the date hereof. The insurance policies listed on Schedule IV.9 include all policies of insurance that are required by material commercial contracts relating to the Business, in the amounts required under the Assumed Contracts. All the insurance policies listed on Schedule IV. 9 are in full force and effect, all premiums due and payable thereon have been paid, no notice of cancellation or termination has been received by Seller with respect to any such policy and no claim under any such policy is pending or has been made by any insured thereunder.

10. Non-Contravention; No Consents. Pursuant to the CRO Order, neither the execution and delivery of this Agreement by Seller nor the consummation or performance of any of the transactions contemplated by this Agreement will give any person the right to prevent, delay or otherwise interfere with any of the transactions contemplated hereby pursuant to (i) any provision of Seller's certificate of incorporation; (ii) any resolution adopted by the board of directors or the shareholders of Seller; or (iii) any contract or agreement to which Seller is a party or by which Seller may be bound.

Except for the Sale Order or as otherwise set forth in Schedule IV.10, Seller is not and will not be required to obtain any consent from any person in connection with the execution and delivery of this Agreement or the consummation or performance of any of the transactions contemplated hereby.

11. Employees and Independent Contractors. To the Knowledge of Seller, Seller has not waived any of its rights to enforce any contractual or common law rights with respect to the obligations of any current or former employees or consultants of the Seller to maintain the confidentiality of the manner in which Seller has operated its business and the trade secrets of the Seller or the rights to enforce any other restrictive covenant agreements between the Seller and its current or former employees and consultants.

12. Sufficiency of Assets Held by Seller. Without limiting any of the representations and warranties set forth in Article 4 of this Agreement, the Acquired Assets include all tangible and intangible assets, property and rights held for use, used in or required for use in the operation of the Business as conducted by Seller prior to the Petition Date, and are sufficient for the operation of the Business from and after the Closing by Buyer in the manner conducted by Seller prior to the Petition Date.

13. Good Faith. This Agreement and all Ancillary Agreements were negotiated and entered into at arm's length and, to the Seller's Knowledge, in good faith, and Seller and Buyer did not engage in any collusion with respect to setting or fixing the Purchase Price, and to the Knowledge of Seller, there are no facts to support a finding that Buyer negotiated and entered into this Agreement and all Ancillary Agreements other than in good faith as described in Section 363(m) of the Bankruptcy Code.

ARTICLE V.
BUYER'S INVESTIGATION: AS-IS PURCHASE

Buyer's Investigation; "As Is" Purchase. Except as otherwise expressly provided in this Agreement

1. The Buyer is not relying on any statement or representation of the Seller, its agents or its representatives nor on any information supplied by the Seller, its agents or its representatives, except as expressly provided in this Agreement or as represented to the Bankruptcy Court;

2. Subject to Seller's representations, warranties, covenants, and indemnifications contained in this Agreement and in documents entered into in connection with this Agreement, the Buyer, in entering into this Agreement and in completing its purchase is relying entirely on its own investigation of the Acquired Assets;

3. Buyer expressly acknowledges that this Agreement and the transaction contemplated herein is entered into on an "as-is" basis;

4. Buyer shall purchase the Acquired Assets in their "as-is" condition as of the date of the Closing Date, and, therefore, and Buyer expressly assumes all risks, obligations and liabilities arising from, and in any way related to, the Acquired Assets, after the Closing Date; and

5. Nothing contained in this Section V shall effect the Buyer's rights against any third party, or protect any third party from the claims of Buyer.

ARTICLE VI.
COVENANTS

1. Access. Prior to the Closing, Seller shall give Buyer and its authorized representatives reasonable access to all of its personnel, books, records, plants, offices, and other facilities and properties, and permit Buyer to make such inspections thereof as Buyer may reasonably request, and cause its officers and advisors to furnish Buyer with such financial, operating and other information regarding the Seller's business, agreements, commitments, liabilities, personnel, and properties as Buyer may reasonably request.

2. Confidentiality. Except as otherwise may be required by Law or an order of the Bankruptcy Court,

(a) Seller shall, and shall cause its affiliates and representatives to, keep confidential and not disclose to any other person or entity or use for his or its own benefit or the benefit of any other person or entity any confidential proprietary information, technology, know-how, trade secrets (including all results of research and development), product formulas, designs, franchises, inventions or other intellectual property regarding Buyer or Seller or their respective business and operations ("Confidential Information") in his or its possession or control. The obligations of Seller under this Section VI.2(a) shall not apply to Confidential Information which (i) is or becomes generally available to the public without breach of the commitment provided for in this Section; or (ii) is required to be disclosed by Law; provided, however, that, in any such case, Seller shall notify Buyer as early as reasonably practicable prior to disclosure to allow Buyer to take appropriate measures to preserve the confidentiality of such Confidential Information.

(b) Seller shall, and shall cause its affiliates and representatives to, use its reasonable best efforts to preserve the confidentiality of the Confidential Information, including entering into confidentiality agreements (to be delivered prior to the distribution of any confidential information by the Seller to a Person (other than the Buyer or its permitted transferee)) in form and substance satisfactory to the Seller, and which

shall inure to the benefit of any purchaser of the Acquired Assets; without limiting the foregoing, each confidentiality agreement executed by such Person shall contain standard non-solicitation provisions.

3. Further Assurances.

(a) From time to time after the Closing, Buyer shall, at the request of Seller, execute and deliver any further instruments or documents and take all such further action as Seller may reasonably request in order to evidence the consummation of the transactions contemplated hereby. From time to time after the Closing, Seller shall, at the request of Buyer, execute and deliver any further instruments or documents and take all such further action as Buyer may reasonably request in order to evidence the consummation of the transactions contemplated hereby. Without limiting the generality of the foregoing, Seller shall complete or cause to be completed all necessary actions to effect transfer of the domain registrations for all of the domains listed on Schedule I.2(a)(xv).

(b) After the Closing, Seller shall promptly transfer or deliver to Buyer cash, checks (which shall be properly endorsed) or other property that Seller may receive in respect of any deposit, prepaid expense, receivable or other item that constitutes part of the Acquired Assets or relates to the Assumed Liabilities. After the Closing, Buyer shall promptly transfer or deliver to Seller cash, checks (which shall be properly endorsed) or other property that Buyer may receive in respect of any item that is an Excluded Asset or relates to the Excluded Liabilities.

(c) Promptly following the Closing, but in no event later than ten (10) Business Days following the Closing, Seller shall (i) file a Certificate of Amendment to Seller's Certificate of Incorporation, changing its and its subsidiaries' corporate names to names dissimilar from "Skylock," and thereafter promptly deliver to Buyer evidence of such corporate name change and (ii) change the caption of Seller's bankruptcy case to reflect the new corporate name.

4. Employee Matters.

(a) Buyer intends to extend offers of employment (which may be for employment with Buyer or any of its affiliates) to all of Seller's employees set forth on Schedule VI.4 as of the date hereof who have not been terminated or otherwise left the employ of the Seller prior to the Closing Date, provided, however, Buyer shall be permitted to add or remove employees or otherwise modify Schedule VI.4 up to two (2) days prior to Closing. On the date which is two (2) days prior to the Closing Date, Buyer shall provide an updated Schedule 5.4 to Seller. Consistent with applicable law, Seller shall provide Buyer access to its personnel records and personnel files, and shall provide such other information regarding their employees as Buyer may reasonably request. All such employees who accept such offers of employment with Buyer or its affiliates are hereinafter referred to as the "Transferred Employees" and such acceptance of offers shall be effective immediately after the Closing. Effective as of immediately before the Closing, Seller shall terminate the employment of its respective employees who are Transferred Employees. Each Transferred Employee shall be entitled to participate in all of Buyer's employee benefit plans in accordance with the terms of those plans, to the same extent and in the same manner as new employees of Buyer.

(b) Prior to the Closing Date, Buyer, Jim Pease shall execute an agreement regarding the terms and conditions of Mr. Pease's post-Closing employment by Buyer (the "Pease Agreement").

(c) With respect to any benefit plans, programs, and arrangements of Buyer in which Transferred Employees participate after the Closing, Buyer shall use commercially reasonable efforts to: (i) waive all limitations as to pre-existing conditions, exclusions and waiting periods with respect to participation and coverage requirements applicable to Transferred Employees to the extent such limitations were waived or otherwise satisfied under the comparable Benefit Plans, and (ii) recognize all service of Transferred Employees with Seller for purposes of eligibility to participate, but only to the same extent such service would be taken into account under a comparable Benefit Plan immediately prior to the Closing. Notwithstanding the

foregoing, Buyer shall have the right, in the good faith exercise of its managerial discretion, to make changes or cause changes in the compensation, benefits (including retiree medical, pension, thrift plan or other benefits), and other terms of employment, including termination, for any Transferred Employee.

(d) Seller shall be solely responsible for any liability, claim or expense with respect to employment, termination of employment, compensation or employee benefits of any nature (including, but not limited to the benefits to be provided under the Benefit Plans) owed to any current or former employee, officer, director, member, manager, partner or independent contractor of Seller (or the beneficiary of any such individual) whether or not such individual becomes a Transferred Employee, that arises out of or relates to the provision of services to or on behalf of, or the employment relationship between, Seller and any such individual or the termination of such relationship or provision of services on or before the Closing Date. Without limiting the foregoing, (i) Seller shall be responsible for the payment of any severance payment or benefits that become due to any current or former employee, officer, director, member, partner or independent contractor as a result of the termination of such individual by Seller and (ii) the Seller shall be responsible for all legally mandated health care continuation coverage for its current and former employees (and their qualified beneficiaries) who had or have a loss of coverage due to a "qualifying event" (within the meaning of Section 603 of ERISA) which occurred or occurs on or prior to the Closing Date including, without limitation, any loss of coverage that results directly or indirectly from the transactions contemplated by this Agreement. Buyer or its affiliates shall be responsible for any severance benefits for any Transferred Employee who terminates employment with the Buyer or such affiliate after the Closing Date.

(e) The provisions of this Section 5.4 are for the benefit of the parties to this Agreement only and shall not be construed to grant any rights, as a third party beneficiary or otherwise, to any person who is not a party to this Agreement, nor shall any provision of this Agreement be deemed to be the adoption of, or an amendment to, any employee benefit plan, as that term is defined in Section 3(3) of ERISA, or otherwise to limit the right of Buyer or the Seller to amend, modify or terminate any such employee benefit plan. In addition, nothing contained herein shall be construed to (i) prohibit any amendments to or termination of any employee benefit plans or (ii) prohibit the termination or change in terms of employment of any employee (including any Transferred Employee) as permitted under applicable law. Nothing herein, expressed or implied, shall confer upon any employee (including any Transferred Employee) any rights or remedies (including, without limitation, any right to employment or continued employment for any specified period) of any nature or kind whatsoever, under or by reason of this Agreement.

5. Bankruptcy Court Orders.

(a) In connection with the transactions contemplated by this Agreement, Seller has filed with the Bankruptcy Court a motion for approval of this Agreement and shall use its reasonable best efforts to obtain entry of an order (the "Sale Order") in form and substance acceptable to Buyer, among other things, (i) approving the Asset Acquisition by Buyer (free and clear of all Encumbrances pursuant to Sections 363(b) and 363(f) of the Bankruptcy Code), (ii) approving the assumption by and assignment to Buyer of the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code. Seller shall supplement its motion(s) to seek findings of fact and conclusions of law that Buyer is a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code upon receipt from Buyer of a declaration supporting such findings. The Sale Order shall contain findings that Buyer is not a successor to Seller and shall not be liable under any theory of successor liability (the "Sale Motion"). Buyer shall support the Sale Motion.

(b) If the Sale Order or any other Orders of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to any such Order), Seller shall diligently defend against such appeal, petition or motion and shall use its reasonable best efforts to obtain an expedited resolution of any such appeal, petition or motion; provided that Seller consult with Buyer at Buyer's reasonable request regarding the status of any such Actions.

(c) Seller shall consult with Buyer and its representatives upon Buyer's reasonable request concerning the Sale Order, any other Orders of the Bankruptcy Court and the bankruptcy proceedings in connection therewith and provide Buyer with copies of requested applications, pleadings, notices, proposed orders and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court. Seller further covenants and agrees that, after the Closing, the terms of any reorganization or liquidation plan it submits to the Bankruptcy Court or any other court for confirmation shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement, including, any transaction contemplated by or approved pursuant to the Sale Order.

6. Assumption and Rejection of Contracts and Leases.

(i) At the election of Buyer pursuant to written notice given to Seller at any time prior to the Closing Date, Seller shall seek to assume or reject, as directed by Buyer, any executory contracts or unexpired leases to which Seller is a party or is otherwise bound. Seller shall give written notice to Buyer prior to the submission of any motion in their Chapter 11 Case to assume or reject any executory contracts or unexpired leases, and, without the prior written consent of Buyer, Seller shall not assume or reject any executory contract or unexpired lease. Any executory contracts or unexpired leases that are rejected subject to Bankruptcy Court approval or are the subject of a rejection motion on the Closing Date, after complying with the provisions of this Section 5.6 shall constitute Excluded Assets at Closing and shall not constitute an Assumed Contract.

(ii) Seller has provided Buyer with a written schedule of the contracts and leases that may be assumed and assigned, together with the Seller's best estimate of the default or deficiencies and Cure Costs for each executory contract or unexpired lease to which Seller is a party or is otherwise bound. Seller shall have an ongoing obligation to update any such estimate to the extent any updates are received by Seller prior to the Closing Date. For purposes of this Agreement, "Cure Costs" shall mean all monetary liabilities, including prepetition monetary liabilities, of Seller that must be paid or otherwise satisfied to cure all of the Seller's monetary defaults under the Assumed Contracts at the time of the assumption thereof and assignment to Buyer as provided hereunder as such amounts are determined by the Bankruptcy Court. The Cure Costs shall be paid by Buyer.

7. Compliance with Privacy Policy

To the extent "personally identifiable information" (as that term is defined in section 101 of the Bankruptcy Code) is included in the Acquired Assets and transferred to Buyer at Closing, Buyer shall comply with the Debtor's privacy policy as it was in effect on the Petition Date with respect to any such transferred personally identifiable information.

8. Schedules

Seller shall deliver to Buyer, as soon as practicable but in any event not later than ten (10) Business Days following the date hereof, updated schedules to Article IV of this Agreement, which schedules may reflect events occurring prior to or following the date hereof to the date thereof. Such updated schedules shall serve to qualify the representations and warranties of the Seller which are the subject thereof as of each of the date of this Agreement and the Closing Date.

## ARTICLE VII.
## CONDITIONS TO BUYER'S OBLIGATIONS

The obligation of Buyer to consummate the transactions contemplated hereby at the Closing shall be subject to the satisfaction or waiver on or prior to the Closing Date of all of the following conditions:

1. Representations and Warranties True and Correct. The representations and warranties of Seller contained in this Agreement and the Ancillary Agreements (without giving effect to any limitations as to "materiality" or "Material Adverse Effect" set forth therein) shall be true and correct at and as of the Closing Date with the same effect as though made at and as of such time (except for representations that are as of a specific date which representations shall be true and correct as of such date), except where all failures to be so true and correct would not reasonably be expected, individually or in the aggregate, to have a material adverse effect on Seller's ability to consummate the transactions contemplated hereby.

2. Covenants and Agreements Performed. The Seller shall have performed or complied with in all material respects, or delivered, all covenants, agreements (including the Ancillary Agreements), conditions or documents required by this Agreement to be performed, complied with, or delivered by or on behalf of Seller prior to or on the Closing Date.

3. No Prohibition or Proceedings. No Litigation, inquiry or request for information by any Authority and no legal or administrative proceeding shall have been instituted that (a) seeks to restrict, limit, prohibit or enjoin the transactions contemplated by this Agreement, or (b) could reasonably be expected to have a Material Adverse Effect.

4. No Injunction or Statute. No statute, rule, regulation, executive order, decree, injunction or other order enacted, entered, promulgated, enforced or issued by any Authority preventing consummation of the transactions contemplated by this Agreement shall be in effect on the Closing Date.

5. Material Adverse Effect. At the Closing Date, there is no, and since the date hereof, there has not been a Material Adverse Effect.

6. Bankruptcy Court.

(i) Seller shall have withdrawn its *Motion for Authorization to Sell Certain Machinery and Equipment Free and Clear of Liens, Claims and Encumbrances* [Dkt. 106] filed on November 18, 2024.

(ii) The Bankruptcy Court shall have entered the Sale Order by the Closing Deadline, and the Sale Order shall have become a Final Order, shall have remained in full force and effect and shall not have been stayed, vacated, modified or supplemented without Buyer's prior written consent. The Sale Order shall be in form and substance acceptable to Buyer.

7. Execution of Agreement. Buyer and Seller shall have executed this Agreement in form and substance acceptable to Buyer.

8. Pease Agreement. The Pease Agreement shall have been executed.

## ARTICLE VIII.
## CONDITIONS TO SELLER'S OBLIGATIONS

The obligations of the Seller to consummate the transactions contemplated hereby at the Closing shall be subject to the satisfaction or waiver on or prior to the Closing Date of all of the following conditions:

1. Representations and Warranties True and Correct. The representations and warranties of Buyer contained in this Agreement and the Ancillary Agreements (without giving effect to any limitations as to "materiality" or "Material Adverse Effect" set forth therein) shall be true and correct at and as of the Closing Date with the same effect as though made at and as of such time (except for representations that are as of a specific date which representations shall be true and correct as of such date), except where all failures to be so

true and correct would not reasonably be expected, individually or in the aggregate, to have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby.

2. Covenants and Agreements Performed. Buyer shall have performed or complied with in all material respects, or delivered, all covenants, agreements (including the Ancillary Agreements), conditions or documents required by this Agreement to be performed, complied with, or delivered by Buyer prior to or on the Closing Date.

3. Bankruptcy Court. The Bankruptcy Court shall have entered the Sale Order by the Closing Deadline, and the Sale Order shall have become a Final Order, shall have remained in full force and effect and shall not have been stayed, vacated, modified or supplemented without Buyer's prior written consent. The Sale Order shall be in form and substance acceptable to Buyer.

4. Execution of Agreement. Buyer and Seller shall have executed this Agreement in form and substance acceptable to Buyer.

## ARTICLE IX.
## TERMINATION PRIOR TO CLOSING

1. Termination. This Agreement may be terminated at any time prior to the Closing:

(a) By the mutual written consent of Buyer and Seller;

(b) By Buyer by written notice given to Seller, if the Closing has not occurred by the Closing Deadline; provided, however, that the right to terminate this Agreement pursuant to this Section 8.1(b) shall not be available to any party whose failure to perform any of its obligations under this Agreement required to be performed by it at or prior to the Closing has been the cause of, or resulted in, the failure of the Closing to occur;

(c) By Seller or Buyer if (i) the Bankruptcy Court shall not have entered the Sale Order by the Closing Deadline, (ii) the Bankruptcy Court enters a Denial Order, or (iii) the Sale Order shall not have become a Final Order on or prior to April 15, 2025;

(d) By Buyer or Seller if Seller complies with the provisions in Section 1.7 and accepts a Qualifying Bid (as defined in Section 1.7) from a Person other than Buyer or its permitted transferee, or by Buyer, if Seller enters into an agreement or transaction, including any Alternate Transaction, with a third party (including any of Seller's creditors or shareholders) which is materially inconsistent with this Agreement and the transactions contemplated hereby in any material respect; or

(e) By either Seller or Buyer by written notice given to the other, if there has been a material breach by (i) Buyer, in the case of notice from Seller, or (ii) Seller, in the case of notice from Buyer, of any of the covenants or agreements made by such parties in this Agreement and such breach (if curable) has not been cured or waived within seven (7) days after notice of the same.

2. Effect on Obligations. Termination of this Agreement pursuant to Section 8.1 shall terminate all obligations of the parties hereunder, except for their obligations under Section 1.4, Section 1.7, this Article IX, Article XI, and Section 10.8, which shall remain in full force and effect; *provided, however*, that unless this Agreement has been terminated pursuant to Section 8.1(a), termination of this Agreement shall not relieve a breaching party (whether or not it is the terminating party) from any liability to the other party hereto arising from or related to its breach of any covenants or agreements contained herein.

3. Break-Up Fee. If this Agreement is terminated in accordance with Section 8.1(d), then Buyer shall be deemed to have earned the Break-Up Fee and Seller shall, promptly (and in any event as of the closing of the corresponding transaction) pay Buyer (in immediately available funds) the Break-Up Fee.

Buyer's entitlement to the Break-Up Fee shall be deemed an allowed superpriority administrative expense claim pursuant to Section 507(b) of the Bankruptcy Code and must be paid at or before the Closing Date. The Parties hereby acknowledge that the amounts payable pursuant to this Section 8.3 are commercially reasonable and necessary to induce Buyer to enter into this Agreement and consummate the transactions contemplated hereby. For the avoidance of doubt, the covenants set forth in this Section 8.3 are continuing obligations, separate and independent from the Cash Deposit as contemplated in Section 1.4 and other obligations of the Parties (and shall not limit Buyer's other rights and remedies under or in respect of this Agreement), and shall survive termination of this Agreement.

## ARTICLE X.
## TAX MATTERS

1. Transfer Taxes. All Taxes, including, without limitation, all state and local and all recording and filing fees (collectively, the "Transfer Taxes"), that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets or otherwise as a result of the transactions contemplated by this Agreement, and that are not exempt under Section 1146(a) of the Bankruptcy Code, if any, shall be borne by Buyer. Buyer and Seller shall cooperate to (a) determine the amount of Transfer Taxes payable in connection with the transactions contemplated under this Agreement, (b) provide all requisite exemption certificates and (c) prepare and file any and all required Tax Returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities.

2. Wage Reporting. As of the Closing, Seller agrees to join in any election made by Buyer regarding the procedure to be utilized with respect to wage reporting set forth in Revenue Procedure 2004-53.

3. Cooperation on Tax Matters. Buyer and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as is practicable, such information and assistance relating to the Seller and the Acquired Assets (including without limitation access to books and records) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax. Buyer and Seller shall retain all books and records with respect to Taxes for any period up to and including the Closing Date, pertaining to the Seller and the Acquired Assets or the Assumed Liabilities, for at least seven (7) years following the Closing Date. At the end of such period, each party shall provide the others with at least 30 days prior written notice before destroying such books and records, during which period the party receiving such notice can elect to take possession, at its own expense, of such books and records.

## ARTICLE XI.
## MISCELLANEOUS

1. Interpretive Provisions.

(a) Whenever used in this Agreement, (i) "including" (or any variation thereof) means including without limitation and (ii) any reference to gender shall include all genders.

(b) The parties acknowledge and agree that (i) each party and its counsel have reviewed the terms and provisions of this Agreement and have contributed to its drafting, (ii) the normal rule of construction, to the effect that any ambiguities are resolved against the drafting party, shall not be employed in the interpretation of it, and (iii) the terms and provisions of this Agreement shall be construed fairly as to all parties hereto and not in favor of or against any party, regardless of which party was generally responsible for the preparation of this Agreement.

2. Entire Agreement; Survival.

(a) This Agreement (including the certificates, schedules and exhibits attached hereto), together with the Ancillary Agreements, constitute the sole understanding and agreement of the parties with respect to the subject matter hereof.

(b) The representations and warranties contained in this Agreement and the Ancillary Agreements, and any other certificates or documents delivered pursuant to this Agreement, shall not survive the Closing and neither party nor their affiliates shall have any liability to the other, whether prior to or after the Closing (including, without limitation, pursuant to Section 8.2), for any breach thereof. The covenants and obligations contained in this Agreement to be performed at or after the Closing shall survive the Closing hereunder, and each party hereto shall be liable to the other after the Closing for any breach thereof.

3. Successors and Assigns. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties hereto; *provided, however*, that this Agreement may not be assigned by Seller without the prior written consent of Buyer or be assigned by Buyer without the prior written consent of Seller, except that Buyer may, at its election and provided it remains liable for its obligations hereunder, assign this Agreement to one or more affiliates of Buyer, and Buyer or any such assignee may make a collateral assignment of its rights (but not its obligations) under this Agreement to any lender providing financing to Buyer in connection with the Closing.

4. Headings. The headings of the Articles, Sections, and paragraphs of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction hereof.

5. Modification and Waiver. No amendment, modification, or alteration of the terms or provisions of this Agreement shall be binding unless the same shall be in writing and duly executed by the Parties hereto, except that any of the terms or provisions of this Agreement may be waived in writing at any time by the Party that is entitled to the benefits of such waived terms or provisions. No single waiver of any of the provisions of this Agreement shall be deemed to or shall constitute, absent an express statement otherwise, a continuous waiver of such provision or a waiver of any other provision hereof (whether or not similar). No delay on the part of any Party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof.

6. Expenses. Except as otherwise expressly provided herein, each of the Parties hereto shall bear the expenses incurred by that party incident to this Agreement and the transactions contemplated hereby, including all fees and disbursements of counsel and accountants retained by such Party, whether or not the transactions contemplated hereby shall be consummated.

7. Notices. Any notice, request, instruction, or other document to be given hereunder by any Party hereto to any other Party shall be in writing and shall be given by delivery in person, by email transmission, by overnight courier or by registered or certified mail, postage prepaid (and shall be deemed given when delivered if delivered by hand, when transmission confirmation is received if delivered by email during normal business hours, one Business Day after deposited with an overnight courier service if delivered by overnight courier and three days after mailing if mailed), as follows:

to Buyer to:

Adhara Aerospace and Defense, LLC
2 North Lake, Suite 510
Pasadena, CA 91101
Attention: Jason Shlecter
Email: jshlecter@pasadena-private.com

with a copy to:

Dorsey & Whitney LLP
167 Hamilton Ave, Suite 200
Palo Alto, CA 94301
Attention: Rachel Stoian
Email: stoian.rachel@dorsey.com

to Seller to:

Skylock Industries
1290 W. Optical Drive
Azusa, CA 91702
Attention: Jeffrey Nerland
Email: jnerland@paladinmgmt.com

with a copy to:

JEFFREY S. SHINBROT, APLC
15260 Ventura Blvd., Suite 1200
Sherman Oaks, CA 91403
Attention: Jeffrey Shinbrot
Email: jeffrey@shinbrotfirm.com

or at such other address for a party as shall be specified by like notice.

8. Governing Law; Consent to Jurisdiction. This Agreement and any claim related directly or indirectly to this Agreement shall be governed by and construed in accordance with United States Bankruptcy law, and to the extent not applicable, the laws of the State of California, without regard to the principles of conflicts of law thereof that would defer to the substantive laws of any other jurisdiction. The Parties agree that, during the period from the date hereof until the date on which Seller's Chapter 11 Case is closed or dismissed (the "Bankruptcy Period"), the Bankruptcy Court shall have exclusive jurisdiction to resolve any controversy, claim or dispute arising out of or relating to this Agreement or any other agreement entered into in connection herewith. The parties further agree that, following the Bankruptcy Period, unless the Bankruptcy Case is re-opened, any action or proceeding with respect to such controversy, claim or dispute shall be brought against any of the parties exclusively in either the United States District Court for the Central District of California or any state court of the state of California, and each of the parties hereby consents to the personal jurisdiction of such court and the Bankruptcy Court (and to the appropriate appellate courts) in any such action or proceeding and waives any objection, including, without limitation, any objection to the laying of venue or on the grounds of forum non conveniens, which any of them may now or hereafter have to the bringing of such action or proceeding in such respective jurisdictions. Each party acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues, and therefore each party hereby irrevocably and unconditionally waives any right such party may have to a trial by jury.

9. No Third Party Beneficiaries. This Agreement is intended and agreed to be solely for the benefit of the Parties hereto and their permitted successors and assigns, and no other party shall be entitled to rely on this Agreement or accrue any benefit, claim, or right of any kind whatsoever pursuant to, under, by, or through this Agreement.

10. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original and all of which shall constitute the same instrument.

ARTICLE XII.
CERTAIN DEFINITIONS

1. "Ancillary Agreement" means any agreement, exhibit, schedule, statement, document or certificate executed or delivered in accordance with, in connection with or required by this Agreement, and any other agreement or certificate specifically identified as an Ancillary Agreement for purposes of this Agreement.

2. "Alternative Transaction" means (i) any assignment, transfer, conveyance, grant, sale, pledge, exchange, tender, or any other direct or indirect disposition (whether by merger or otherwise) or encumbrance of all or any part of the Acquired Assets or the Business or any rights thereto or therein by Seller (other than the transfer thereof to Buyer or its Affiliates in accordance with this Agreement) or (ii) any assignment, transfer, conveyance, grant, sale, pledge, exchange, tender, or any other direct or indirect disposition (whether by merger or otherwise) or encumbrance of all or any portion of the equity interests in Seller, in each case whether structured or effected (or contemplated to be structured or effected) as an agreement, a plan of reorganization, or otherwise.

3. "APA Deadline" means February 21, 2025, which is one week from the execution of the Term Sheet.

4. "Authority" means the United States of America or any other nation, any state or other political subdivision thereof, or any entity, agency, court or authority (foreign, federal, state or local) exercising executive, legislative, judicial, regulatory or administrative functions of government or any arbitrator or mediator.

5. "Benefit Plans" means all "employee benefit plans," as defined in Section 3(3) of the ERISA and all other retirement, profit sharing, bonus, stock, stock option, equity-based, profits interest, employment, change in control, health, life, disability, group insurance, savings, deferred compensation, incentive compensation, paid time off, severance, salary continuation and other fringe benefit arrangements, plans, programs, contracts, policies, or practices maintained, contributed to, or required to be contributed to by any Seller or any ERISA Affiliate for the benefit of any current or former employee, officer, director, member, partner or independent contractor of any Seller or with respect to which any Seller or any ERISA Affiliate may have any liability.

6. "Break-Up Fee" means the fee payable to the Buyer pursuant to and in accordance with Section 8.3 in an amount equal to $150,000.

7. "Business Day" means any day other than a day on which banks in the State of California are required or authorized to be closed.

8. "Closing Deadline" means March 31, 2025.

9. "Contracts" means all written or oral agreements, contracts, Leases, or commitments to which any Seller is a party or by which Seller or any of its properties or assets is bound as of the date hereof and between the date hereof and the Closing Date.

10. "Control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly or as trustee or executor, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of stock, as trustee or executor, by contract or credit arrangement or otherwise.

11. "Debt" means all principal, interest, premiums, penalties, expenses or other obligations related to (a) all indebtedness of Seller for borrowed money, (b) all obligations (contingent or otherwise) of

Seller for the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and consistent with past practice) (including notes payable to the sellers of such property or services), (c) all obligations of Seller evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by Seller, (e) all obligations of Seller as lessee or lessees under leases that have been or should be, in accordance with GAAP, recorded as capital leases, (f) all obligations, contingent or otherwise, of Seller under acceptance, letter of credit or similar facilities, (g) all obligations owing pursuant to factoring agreements for accounts receivable, (h) all obligations in respect of unfunded pensions, (i) all Debt of the type referred to in clauses (a) through (h) above guaranteed directly or indirectly in any manner by Seller , or in effect guaranteed directly or indirectly by Seller through an agreement (w) to pay or purchase such Debt or to advance or supply funds for the payment or purchase of such Debt, (x) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Debt or to assure the holder of such Debt against loss, (y) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered) or (z) otherwise to assure a creditor against loss; provided, that such Debt referred under this clause (i) is of the type that would be reflected as debt on a balance sheet prepared in accordance with GAAP, (j) all Debt of the type referred to in clauses (a) through (i) above secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any lien on property (including accounts and contract rights) owned by Seller, even though such person has not assumed, become liable for or guaranteed the payment of such Debt, and (k) all accrued but unpaid interest (or interest equivalent) to the date of determination, and all prepayment premiums or penalties payable upon repayment of any items of Debt of the type referred to in clauses (a) through (j) above.

12. "Denial Order" means an Order entered by the Bankruptcy Court denying the approval of the Asset Acquisition by Buyer.

13. "EBITDA" means net income calculated in accordance with GAAP net of interest expense, income tax expense, depreciation and amortization.

14. "Encumbrances" means any charge, claim, community or other marital property interest, condition, easement, encroachment, encumbrance, license, equitable interest, lien, mortgage, deed of trust, option, pledge, security interest, servitude, right of way, right of first option, right of first refusal, or other restriction or third-party right of any kind or nature whatsoever, including any right of first refusal or restriction on voting.

15. "Environmental Laws" means all foreign, federal, state and local laws, rules, regulations, ordinances, the common law, judgments, orders, consent agreements, work practices, standards and norms relating to (i) the protection of the environment (including air, surface and subsurface water, drinking water supplies, surface and subsurface land, the interior of any building or building component, soil and natural resources) or human health or (ii) the presence, Management, Release or threat of Release of or exposure to Hazardous Substances.

16. "Environmental Liabilities" mean any and all losses, claims, demands, liabilities, obligations, causes of action, damages, costs and expenses, fines or penalties (including without limitation attorney fees and other defense costs), known or unknown, foreseen or unforeseen, whether contingent or otherwise, fixed or absolute, present or future asserted against or incurred by Buyer arising out of or related to (a) actual or alleged environmental conditions, including without limitation, (i) the presence, Release, threat of Release, Management or exposure first occurring, or as a result of facts, circumstances or events first existing or occurring, prior to the Closing of or to Hazardous Substances at, on, in, migrating to, migrating from or under any property now or previously owned, operated, used or leased by any Seller or any predecessor of Seller or in connection with Seller's business whether into the air, soil, sediment, bedrock, ground or surface waters, buildings or structures on-site or off-site or (ii) arising from the off-site or on-site transportation, storage, treatment, recycling or disposal of Hazardous Substances Managed or Released by or on behalf of Seller or any

predecessor of Seller or at or from any property now or previously owned, used, operated or leased by any Seller or any predecessor of any Seller or in connection with Seller's business; or (b) any actual or alleged violation of any Environmental Law in connection with the Acquired Assets or the Seller's business first existing prior to the Closing Date (including without limitation costs and expenses required to bring the Acquired Assets, Buyer or Seller into compliance with Environmental Laws and fines, penalties and defense costs incurred after the Closing Date to come into compliance with Environmental Laws).

17. "ERISA" means Employee Retirement Income Security Act of 1974, as amended.

18. "ERISA Affiliate" means any person, entity, trade or business (whether or not incorporated) that is treated as a single employer with Seller under Section 414 of the Code.

19. "Final Order" shall mean an order of the Bankruptcy Court (a) as to which the time to appeal or reconsider shall have expired and as to which no appeal or motion to reconsider shall then be pending, or (b) if an appeal or motion for reconsideration shall have been filed or sought, either (i) no stay of the order shall be in effect or (ii) if such a stay shall have been granted by the Bankruptcy Court, then (A) the stay shall have been dissolved or (B) a final order of the district court having jurisdiction to hear such appeal shall have affirmed the order and the time allowed to appeal from such affirmance or to seek review or rehearing thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible, and if a timely appeal of such district court order or timely motion to seek review or rehearing of such order shall have been made, any court of appeals having jurisdiction to hear such appeal or motion (or any subsequent appeal or motion to seek review or rehearing) shall have affirmed the district court's (or lower appellate court's) order upholding the order of the Bankruptcy Court and the time allowed to appeal from such affirmance or to seek review or rehearing thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible; provided, however, that Buyer in its sole discretion may treat as not being a Final Order, any order for which an appeal, motion to seek review, motion to seek rehearing, or any similar motion is pending notwithstanding that such order is not then subject to stay.

20. "GAAP" means United States generally accepted accounting principles consistently applied throughout the relevant periods.

21. "Hazardous Substances" shall mean any and all hazardous or toxic substances, wastes or materials, any pollutants, contaminants, or explosive materials (including polychlorinated biphenyls, urea formaldehyde, asbestos, volatile and semi-volatile organic compounds, oil, petroleum products and fractions and radioactive materials), or any other similar substances or materials regulated under Environmental Laws.

22. "Intellectual Property" means all patents, trademarks, copyrights, industrial designs, software, databases, data compilations, universal resource locators, World Wide Web addresses, websites and domain names, know-how, trade secrets, product formulas, inventions, rights-to-use and other industrial and intellectual property rights, and all applications and registrations therefor.

23. "IRS" means Internal Revenue Service.

24. "knowledge", "to the knowledge" or "known" and words of similar import shall mean the actual knowledge of a natural person or, with respect to a Person that is not a natural person, the actual knowledge of the officers and management of such Person, after due inquiry.

25. "Knowledge of Seller" or any other similar knowledge qualification in this Agreement means all facts or matters actually known by Jeffrey Nerland and Jim Pease, after due inquiry.

26. "Laws" shall mean any federal, state or local law (including, without limitation, principles of common law), statute, ordinance, regulation, Permit, certificate, judgment, order, award or other determination, decision or requirement of any Authority.

27. "Leases" mean all written or oral leases and subleases of real property to which any Seller is a party (as lessor, lessee, sublessee, licensee or otherwise) (collectively, the "Leased Real Property").

28. "Litigation" means any, dispute, claim, action, suit, proceeding, review, arbitration or investigation before any Authority.

29. "Managed" or "Management" means or refer to the use, possession, generation, treatment, manufacture, processing, management, handling, storage, recycling, transport or disposal.

30. "Material Adverse Effect" means any circumstance or event which, individually or in the aggregate with any other circumstance or event, is or could be reasonably expected to be material and adverse to the business, properties, operations, assets, liabilities (including contingent liabilities), condition (financial or otherwise), EBITDA, prospects, results of operations or material Contracts of Seller, taken as a whole.

31. "Order" shall mean any order, ruling, decision, verdict, decree, writ, subpoena, mandate, precept, command, directive, consent, approval, award, judgment, injunction, or other similar determination or finding by, before, or under the supervision of any Authority.

32. "Permits" mean all governmental or other industry permits, registrations, certificates, certifications, exemptions, licenses, franchises, consents, approvals and authorizations.

33. "Permitted Encumbrances" means liens for Taxes not yet due and payable to the extent such Taxes are timely discharged by Seller.

34. "Person" or "person" means an individual, corporation, partnership, association, limited liability company, trust, unincorporated organization, other entity or group (as group is defined in Section 13(d)(3) of the Exchange Act).

35. "Released" or "Release" means released, spilled, leaked, discharged, disposed of, pumped, poured, emitted, emptied, injected, leached, dumped or allowed to escape.

36. "Tax" means (i) all income taxes (including any tax on or based upon net income, or gross income, or income as specially defined, or earnings, or profits, or selected items of income, earnings, or profits) and all gross receipts, estimated, sales, use, ad valorem, transfer, franchise, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, or windfall profit taxes, unpaid property taxes, environment, alternative, or add-on minimum taxes, custom duties or other taxes, fees, assessments, or charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts and (ii) any obligation to indemnify or otherwise assume or succeed to any liability described in clause (i) hereof of any other Person whether by contract or under common law doctrine of de facto merger and successor liability or otherwise.

37. "Taxing Authority" means any federal, state, local, and foreign governmental entity or other authority responsible for the collection or assessment of Tax.

38. "Tax Return" means any return, report, information return or other document (including any related or supporting information or any amended return) filed or required to be filed with any Taxing Authority or other authority in connection with the determination, assessment, or collection of any Tax paid or payable or the administration of any laws, regulations, or administrative requirements relating to any such Tax.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed on its behalf as of the date first above written.

**SKYLOCK INDUSTRIES**

By: ______________________________
Name: Jeffrey Nerland
Title: Chief Restructuring Officer

**ADHARA AEROSPACE & DEFENSE LLC**

By: ______________________________
Name: [_______]
Title: [_______]

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed on its behalf as of the date first above written.

**SKYLOCK INDUSTRIES**

By: ______________________________________

Name: Jeffrey Nerland
Title: Chief Restructuring Officer

**ADHARA AEROSPACE & DEFENSE LLC**

By: Iain Whyte (Mar 3, 2025 15:25 PST)

Name: Iain Whyte
Title: Managing Member

**Schedule I.2(a)(vi)**
**Assumed Contracts**[1]

| Counterparty | Contract Name/Description | Cure Amount |
|---|---|---|
| The Boeing Company | Customer Supply Chain Agreement dated 12/1/2020 | N/A |
| DSI Automotive Services | Equipment Financing Arrangement - Supported by Promissory Note | TBD |
| Mitsubishi HC Capital America | Equipment Contract | TBD |
| Sumitomo Mitsui Finance | Equipment Contract | TBD |
| Sumitomo Mitsui Finance | Equipment Contract | TBD |

[1] Purchaser reserves the right to exclude any contracts listed herein up to the Closing per Art. I.2(b)(vi).

**Schedule I.2(a)(xiv)**
**Intellectual Property**

**Trademarks**

None.

**Copyrights**

None.

**Patents**

| Patent # | Publication No. | Application No. | Title | Owner | Status |
|---|---|---|---|---|---|
| 10533354 | 20180112445 | 15299378 | HANDLE ASSEMBLY | Skylock Industries | Expired 2/19/2024 |
| 6010094 | | 9290347 | GALLEY RETAINER | Skylock Industries, Inc. | Expired 1/30/2012 |
| 7051780 | 20030184097 | 10397916 | LATCH ASSEMBLY | Skylock Industries, Inc. | Expired 6/28/2010 |
| D422482 | | 29086495 | GALLEY RETAINER | Skylock Industries, Inc. | Valid |
| | 20040154360 | 10773998 | Flight Deck Door Deadbolt Assembly | Skylock Industries, Inc. | Abandoned 8/18/2007 |

**Schedule I.2(a)(xv)**
**Domain Names**

1. https://www.skylock.com

**Schedule I.2(a)(xvi)**
**Websites and Social Media**

None.

**Schedule I.2(b)(i)**
**Excluded Contracts**[2]

None.

[2] Purchaser reserves the right to designate any additional contracts as an excluded contract up to the Closing per Art. I.2(b)(vi).

**Schedule IV.4**
**Litigation**

| Claimant | Case Number | Court | Type of Claim | Status |
|---|---|---|---|---|
| Wintrust Special Finance | 21PSCV00037 | Los Angeles Superior Court – Pomona Courthouse | Contract/Warranty Breach | Pending |
| Blum Courtyard Associates | 24PSCV02621 | Los Angeles Superior Court – Pomona Courthouse | Breach of Rental Contract | Pending |
| Federal Express | 24PSCV03181 | Los Angeles Superior Court – Pomona Courthouse | Collections | Pending |
| Hutchins General Aircraft Inc. | 24PSCV00957 | Los Angeles Superior Court – Pomona Courthouse | Contract/Warranty Breach | Pending |
| Spirit Aerosystem Inc. | n/a | n/a | Product Quality Issues | Complaint not yet filed |

**Schedule IV.5(a)**
**Licensed Intellectual Property**

None.

**Schedule IV.5(b)**
**Intellectual Property Exceptions**

None.

**Schedule IV.7**
**Subsidiaries and Ownership Interests**

None.

**Schedule IV.8**
**Leases[3]**

| Lessor | Lessor Address | Description | Cure Amount |
|---|---|---|---|
| PPL Optical Holdings, LLC | 2 North Lake Avenue, Suite 510<br>Pasadena, CA 91101 | Real Property Lease – 1290 W. Optical Drive, Azusa, CA 91702 | N/A |

[3] Purchaser reserves the right to exclude any leases listed herein up to the Closing per Art. I.2(b)(vi).

**Schedule IV.9**
**Insurance**

| Insurer | Policy Type | Policy Period | Premium Amount |
|---|---|---|---|
| ProCentury Insurance Company | Workers Compensation | 12/1/2024 – 12/1/2025 | $65,160 Annual Premium |
| Star Insurance Company | Comprehensive (Including, Building & Equipment, General Liability, Umbrella and Parts Liability) | 6/1/2024 – 6/1/2025 | $42,517 Annual Premium |
| Health Net | Health Insurance | Billed Monthly | $22,000 per month |

**Schedule IV.10**
**Required Consents**

None.

**Schedule VI.4**
**Employees**

| Last Name | First Name | Business Title |
|---|---|---|
| REDACTED [redacted] | | Assembly |
| | | Machinist/Set Up |
| | | Asseumbly |
| | | Expeditor |
| | | Deburr/Driver |
| | | Expeditor |
| | | Inspector/QC Inspector |
| | | Mfg. Supervisor |
| | | Duburring |
| | | Machinist/CNC Operator |
| | | Machinist/CNC Operator |
| | | Customer Service/AR |
| | | Welder |
| | | Accounting Manager |
| | | Machinist Programmer |
| | | Machinist/CNC Operator |
| | | Deburring |
| | | Machinist/Lathe Set Up |
| | | Shipping |
| | | Maintenance/Janitor |
| | | Assembly |
| | | Deburring |
| | | Machinist CNC Operator |
| | | Machinist CNC Operator |
| | | Machinist CNC Set Up Mill |
| | | Vice President |
| | | President |
| | | Welder/Furming |
| | | Assembly Supervisor |
| | | Machinist CNC Operator |
| | | Machinist CNC Operator |
| | | Deburring |
| | | Accounting Clerk |
| | | Office Clerk |
| | | Machinist CNC Operator |
| | | Machinist CNC Operator |
| | | Machinist CNC Set Up |
| | | Machinist CNC Operator |
| | | Machinist CNC Set Up |
| | | Deburring |
| | | Machinist CNC Operator |
| | | Assembly |



4906-2075-9075\2

## Independent Contractors

| Last Name | First Name | Business Title |
|---|---|---|
| REDACTED [redacted] | | Machinist CNC Operator |
| | | Deburring |
| | | Purchasing |
| | | Expeditor |
| | | Purchasing |

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

15260 Ventura Blvd., Suite 1200
Sherman Oaks, CA 91403

A true and correct copy of the foregoing document entitled (*specify)*: **SUBMISSION OF ASSET PURCHASE AGREEMENT:** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below.

**X 1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 3/5/2025, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Kathryn M.S. Catherwood** kcatherwood@grsm.com, mbrookman@grsm.com;asoto@grsm.com;jswanson@grams.com
- **Alan W Forsley** alan.forsley@flpllp.com, awf@fkllawfirm.com,awf@fl-lawyers.net,addy@flpllp.com,andrea@flpllp.com
- **Jeffrey I Golden** jgolden@go2.law, kadele@ecf.courtdrive.com;cbmeeker@gmail.com;lbracken@wgllp.com;dfitzgerald@go2.law;golden.jeffreyi.b117954@notify.bestcase.com
- **Nicolino Iezza** niezza@spiwakandiezza.com
- **David Leichtman** dleichtman@leichtmanlaw.com
- **Misty A Perry Isaacson** misty@ppilawyers.com, ecf@ppilawyers.com;pagterandperryisaacson@jubileebk.net
- **Christopher J Petersen** chris.petersen@blankrome.com, evelyn.rodriguez@blankrome.com
- **Matthew D Pham** mpham@allenmatkins.com, mdiaz@allenmatkins.com
- **Dean G Rallis** drallis@hahnlawyers.com, jevans@hahnlawyers.com;drallis@ecf.courtdrive.com;jevans@ecf.courtdrive.com
- **David Samuel Shevitz** David.S.Shevitz@usdoj.gov
- **Jeffrey S Shinbrot** jeffrey@shinbrotfirm.com, sandra@shinbrotfirm.com;tanya@shinbrotfirm.com
- **Rachel P Stoian** stoian.rachel@dorsey.com, stell.laura@dorsey.com
- **United States Trustee (LA)** ustpregion16.la.ecf@usdoj.gov
- **Shane Wax** swax@leichtmanlaw.com
- **Courina Yulisa** yulisa.courina@dorsey.com

**X SERVED BY UNITED STATES MAIL**: On (*date*) 3/5/2025, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

X Additional service list attached.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*), I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 3/5/2025 | Sandra Rodriguez | /s/Sandra Rodriguez |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

Case Number: 2:24-Bk-17820-Bb

Cro
Jeff Nerland
Paladin Management Group, Llc
633 W. 5th Street 26th Floor
Los Angeles, Ca 90071
Email: Jnerland@Paladinmgmt.Com

Potential Purchasers:

A & M Engineering Inc
15854 Salvatiera St
Irwindale, California
B.Beljak@Amengineeringinc.Com

Briles Aeorspace-
559 W 135th St,
Gardena, Ca 90249

Crane Co.
100 First Stamford Place
Stamford, Connecticut 06902

Curtiss-Wright Corporation
130 Harbour Place Drive
Suite 300
Davidson, NC 28036
Info@Curtisswright.Com

CMI Group
3801 E La Salle St #4
Phoenix, AZ 85040

Ducommun Inc.
801 Royal Oaks Dr,
Monrovia, CA 91016

Heico Aerospace Corporation
3000 Taft Street
Hollywood, FL 33021.

Loar Group
20 New King St
White Plains, NY, 10604-1204

Superior Thread Rolling Co.
12801 Wentworth St
Arleta, CA 91331

Transdigm Group
1350 Euclid Ave #1600
Cleveland, Oh 44115

Esco Technologies
9900 Clayton Rd # A,
St. Louis, Mo 63124

Fortive Corporation
6920 Seaway Blvd
Everett, Wa 98203

Conesys
2280 W 208th St
Torrance, Ca 90501

Crawford United Corp.
10514 Dupont Ave.
Cleveland, Oh 44108

The Gill Corp
4056 Easy St
El Monte, Ca 91731

First National Capital
38 Discovery Suite 150
Irvine, Ca 92618

Architect Equity
2101 E. El Segundo Blvd
Suite 503
El Segundo, California 90245

ArclineNashville
3803 Bedford Avenue
Suite 106
Nashville, TN 37215

Avem Partners
3030 Red Hill Avenue
Santa Ana, Ca 92705

Concord Ventures
500 108th Ave Ne Unit 1100
Bellevue, WA 98004

CMI Group/ Gallant Capital
10100 Santa Monica Blvd, Suite 1400
Los Angeles, CA 90067

Business Services Endeavour
7111 Santa Monica Blvd B163
West Hollywood, CA 90046

Imperial Capital
10100 Santa Monica Blvd #2400
Los Angeles, Ca 90067

Liberty Hall Capital Partners
200 Meeting Street, 2nd Floor
Charleston, South Carolina 29401

Pacific Growth Investors
21515 Hawthorne Boulevard, Suite 940
Torrance, Ca 90503

Vance Street Capital
15304 Sunset Blvd., Suite 200
Los Angeles, Ca 90272

RBC Bearings
One Tribology Center
Oxford Ct 06478

Adhara Aerospace And Defense Llc
2 North Lake Suite 510
Pasadena, Ca 91101

DSI Automotive Services, Inc.
C/O Matthew D. Pham
Allen Matkins Et Al. Llp
865 S. Figueroa St., Ste. 2800
Los Angeles, CA 90017

Mitsubishi Hc Capital America

800 Connecticut Avenue
Norwalk, Ct 06854

Pasadena Private Lending Inc.
Attn: Jason Shlecter
2 North Lake Ave. Ste. 510
Pasadena, Ca 91101 1

Sumitomo Mitsui Finance & Leasing Co. Ltd.
C/O Kye Law Group, P.C.
201 Old Country Road
Suite 120
Melville, Ny 11747

Us Small Business Administration
Assigned To Adhara Aerospace And Defense Llc
2 N. Lake Ste. 510
Pasadena, Ca 91101

Jeffrey B.Crevoiserat
335 W. Enid Drive
Key Biscayne, Fl 33149

Abrasive Finishing Company
14920 South Main Street
Gardena, Ca 90248

Accurate Bushing Co., Inc.,
443 North Avenue
Garwood, Nj 07277

Aircraft X-Ray Laboratorie Inc.
5216 Pacific Blvd,
Huntington Park, Ca 90255

Fdh Aero Llc
5200 Sheila Street
Commerce, Ca 90040

Consolidated Industries Inc.,
677 Mixville Road
Cheshire, Ct 06410-3800
C/O Carmine J. Scriarretto
Vp, Finance And Administration
Email: Carmine Sciarretto At Csciarretto@Consolindustries.Com

Don Redmon
13246 W. Cameridge Ave
Goodyear, Az 85395-2118

Federal Express
Po Box 7221
Pasadena, Ca 91109-8321
310-563-4042

General Aircraft Company
321 Kinetic Drive
Oxnard, Ca 93030

Health Net Insurance
File # 52617
Los Angeles, Ca 90074-2617

Los Angeles County Treasurer &Tax Collector
Attn Bankruptcy Unit
Po Box 54110
Los Angeles Ca 90054-0110

Multitect Cnc
38588 Lion Way
Palmdale, Ca 93551

Nd Testing, Inc.,
11473 Pacific Avenue
Fontana, Ca 92337

Plymouth Tube Company
29w150 Warrenville Rd
Warrenville Il 60555-3528
Sales@Plymouth.Com

Pro Century Insurance
Po Box 30002
Tampa, Fl 33630-3002

Service Steel Aerospace-Corporate Office
4609 70th Avene E
Fife, Wa 98424

Sierra Alloys Co.
5467 Ayon Avenue
Irwindale, Ca 91706
Info@Sierraalloys.Com

Specline
2230 Mouton Dive
Carson City, Nv 89706

Supra Alloys
C/O Castle Metals
1420 Kensington Rd Ste. 220
Oak Brook, Il 60523

Titanium Industries
Corporate Headquarters
18 Green Pond Road
Rockaway, Nj 07866

Wencor, Llc
3577 S. Mountain Vista Parkway
Provo, Ut 84606

Spirit Aerosystems, Inc.
3801 S. Oliver Steet
Wichita, Ks 67210

Blum Courtyard Association
505 Sansome St., Ste. 900
San Francisco, Ca 9411

FPD Company
124 Hidden Valley Rd.
Canonsburg, Pa 15317

Highland Capital Corp.
Segal Mccambridge Et Al.
233 S. Wacker Dr., # 5500
Chicago, Il 60606

L&J Investment Holdings Llc
C/O David Leichtman, Esquire
185 Madison Ave., Ste., 15th Floor
New York Ny 10016

Lanz Machining
1747 E. Avenue Q Unit D2
Palmdale, Ca 93550

Plascore
Po Box 170
Zeeland, Mi 49464

Rexnord Industries
Po Box 93944
Chicago, Il 60673

1290 Optical Drive Llc
1290 Optical Drive
Azusa, Ca 91702

Aaa Stamping
Po Box 4027
Chino, Ca 91708

Acro-Spec Grinding Co. Inc.
4134 Indus Way
Riverside, Ca 92503-4847

Airgas Welding Supply
Po Box 7423
Pasadena, Ca 91109-7423

Adept Fasteners
Po Box 579
Castaic, Ca 91310-0579

All Industrial Chem
Po Box 4500-Unknown Box
Fort Lauderdale, Fl 33338-4500

All Star Fastners
2113 S. Standard Avenue
Santa Ana, Ca 92707-3034

Alloy Processing

Po Box 101963
Pasadena, Ca 91189-0068

Altus Receivables Management
2121 Airline Drive Suite 520
Metairie, La 70001-5987

Amberwick Corporation
2304 W. 16th Street
Long Beach, Ca 90813-1044

American Drilling Company
Po Box 1720
Lawndale, Ca 90260-6620

American Express
P.O. Box 297858
Ft. Lauderdale, Fl 33329-7858

Azusa Light & Water
729 N Azusa Ave
Azusa, Ca 91702-2528

Banc Of America Leasing & Capital L
C/O Serlin & Whiteford, Llp
900 Howe Avenue Ste. 250
Sacramento, Ca 95825-3939

Banterra Bank
111 Airway Drive
Marion, Il 62959-5872

Basil Sami Shiber, Esquire
Miller Starr Regalia
1331 N. California Blvd., 6fl
Po Box 8177
Walnut Creek, Ca 94596-8177

Bell Helicopter
3255 Bell Flight Blvd.,
Fort Worth, Tx 76118

Bisco Industries
Po Box 68062
Anaheim, Ca 92817

Bodycote Thermal Processing
Processing Dept.9692
Los Angeles, Ca 90084-0001

Boeing Company
929 Long Bridge Drive
Arlington, Va 22202-4208| |||

Bralco Industries
Bralco Metals Llc
3010 Old Ranch Parkway Suite 400
Seal Beach, Ca 90740-2750

Blank Rome, Llp
Attn: Chrisopher Petersen
2029 Century Park East 6th Fl
Los Angeles, Ca 90067

California Dept. Of Tax And Fee Administrati
Collection Support Bureau Mic: 29
Po Box 942879
Sacramento, Ca 94279-0029

Canon Financial Services
14904 Collections Center Drive
Chicago, Il 60693-0149| |||

Pathward National Association
5480 Corporate Drive Suite 350
Troy Mi 48098-2642

Darin St.Ivany
441 32nd Street
Manhattan Beach, Ca 90266-3928

Darin St. Ivany-Unable To Forward
Dsi Automotive Services Inc
849 Appollo St., Ste. 206
El Segundo, Ca 90245

Edward Chang Yim, Esquire
Castandeda Law Apc
1055 Wilshire Blvd., Ste 1940
Los Angeles, Ca 90017-5602

Hsbc Bank Usa Na
Commercial Loan Service Suite 0002
Celoron, Ny 14720

Hta Heat Treat
10140 Romandel Avenue
Santa Fe Springs, Ca 90670-3434

Hutchins General Aircraft Inc.,
Dba General Aircraft Company
Spiwak & Iezza, Llp
555 Marin St., Ste. 140
Thousand Oaks, Ca 91360

I & R Company Llc
221 W. Alamdeda Ave Ste. 205
Burbank, Ca 91502-3032

Inl Spring Mfg Co.
4201 Santa Ana St Ste. A
Ontario, Ca 91761-1554| |||

Internal Revenue Service
P.O. Box 7346
Philadelphia, Pa 19101-7346

Inventory Locator Service Llc
8001 Centerview Parkway Ste. 400
Cordova, Tn 38018-4276

Jan Kens
715 E. Cypress
Monrovia, Ca 91016-4254

Jeff Crevoiserat Holdings
18555 Collins Avenue Unit 801
North Miami Beach, Fl 33160-2498

Jeffrey B.Crevoiserat
335 W. Enid Drive
Key Biscayne, Fl 33149-2005

Jimmie A. Pease
10929 Walnut Drive
Sunland, Ca 91040-1356

L.A. Commercial Group Inc.,
Dba Continental Commercial Group An
1111 N. Brand Blvd., Suite 401
Glendale, Ca 91202-3071

Law Office Of Dean G. Thompson
3317 W. Beverly Blvd., Ste 107
Montebello, Ca 90640-1570

Lewis Roca Rothgerber Christie Llp
Corporate Headquarters
201 East Washington St., Ste.1200
Phoenix, Az 85004-2595

Long K. Bui, Esquire
Sakaida & Bui
2355 Westwood Blvd., # 327
Los Angeles, Ca 90064-2109

Luis Jimenez
L&J Investments Holdings Llc
1345 Aenue Of The Americas 2nd Fl
New York, Ny 10105-0008

M B Stamping
10756 Weaver Ave South
South El Monte, Ca 91733-2749

Mcmaster-Carr
Po Box 7690
Chicago, Il 60680-7690

Mercury Broach
2546 Seaman Ave
South El Monte, Ca 91733-1986

Midland Equipment Finance
5403 Olympic Drive Nw Ste. 200
Gig Harbor, Wa 98335-1853

Office Solutions
233030 La Palma Ave
Yorba Linda, Ca 92887

Precision Control Finishing, Inc.

12150 S. Bloomfield Ave Ste D
Santa Fe Springs, Ca 90670-4744

Precision Instrument Correction Inc
933 Mariner St
Brea, Ca 92821-3827

Pts Solutions
Po Box 670587
Detroit, Mi 48267-0587

Pvs Valley Alarm
Po Box 311
San Fernando, Ca 91341-0311

Phillips Lytle Llp
30 South Pearl Street
Albany, Ny 12207-1537

R.L. Anodizing And Plating
11331 Penrose St
Sun Valley, Ca 91352-3109

Rolled Alloys
Po Box 67000 Dept 33901
Detroit, Mi 48267-0002

Ryan Kampa
11026 Rincon Dr.
Whittier, Ca 90606-1544

S&D Industrial Tool Supply
685 S. Manchester Avenue
Anaheim, Ca 92802-1434

Saw Service Of America
8210 Industry Ave
Pico Rivera, Ca 90660-4894

Selway Machine Tool Company
29250 Union City Blvd.,
Union City, Ca 94587-1279

Shcg, Llc
1590 Eseramce Drive

Simi Valley, Ca 93065-1611

Ski-Sundries
10 Melanie Ln
Fryeburg, Me 04037-4665

Supreme Steel Treating
2466 Seaman Ave
South El Monte, Ca 91733-1926

Safety-Kleen Corp
Po Bo X975201
Dallas, Tx 75397-0001

Siemens Financial Services, Inc.,
170 Wood Ave South
Iselin, Nj 08830-2741

Siemens Financial Services, Inc.,
Attn: Ligitgation Counsel
4800 North Point Parkway
Alpharetta, Ga 30022-3732||

Southern California Edison Company
1551 W San Bernardino Road
Covina Ca 91722-3407

The Home Depot Pro
Po Bo X742440
Los Angeles, Ca 90074-0001

Two Brothers Custom Silkscreen
10754 Weaver Ave
South El Monte, Ca 91733-2749

Tech-Mar Capital Llc
16509 S. W. 54th Court
Hollywood, Fl 33027-5604

Uline
Po Bo X88741
Chicago, Il 60680| |||

Ver-Sales, Inc.
2509 N. Naomi St

Burbank, Ca 91504-3236

West Valley Plating
21061 Superior St
Chatsworth, Ca 91311-4330

Western Tool & Supply Co.
Po Bo X2420
Livermore, Ca 94551

Wesco Aircraft
27727 Avenue Scott
Valencia, Ca 91355-3909

West Air
3001 E. Miraloma Avenue
Anaheim, Ca 92806-1809

Wright Finlay & Zak, Llp
4665 Macarthur Court Suite 200
Newport Beach, Ca 92660-1811

William Neiman
C/O Law Offices Of Kenneth H. Bayer
2535 Townsgate Rd.Suite 307
Westlake Village, Ca 91361-5984

William L. Neiman
1164 Amalfi Drive
Pacific Palisades, Ca 90272

California Dept. Of Tax And Fee Administration
Collection Support Bureau Mic: 29
Po Box 942879
Sacramento, Ca 94279-0029

Pacific Functional Fluids, Llc
Victor C Franck
7318 Augusta Pines Drive
Spring, Tx 77389

Victor C. Franck
7318 Augusta Pines Dr

Spring, Tx 77389

Skylock Holdings, Llc
7318 Augusta Pines Dr.
Spring, Tx 77389

Jim A. Pease
30112 Sharp Rd.
Castaic, Ca 91384

Shadow Hills Consulting Group
Attn: Jim A. Pease
9155 Omelveny Ave.
Sun Valley, Ca 91352

Safran Cabin Inc
5701 Bolsa Avenue
Huntington Beach Ca 92647